Docket No. 94748–Agenda 23–September 2003.

CHRISTY ADAMS, Special Adm’r of the Estate of Janice Adams, Deceased, Appellee, v. NORTHERN ILLINOIS GAS COMPANY, Appellant.

Opinion filed April 1, 2004.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff, Christy Adams, as special administrator of the estate of Janice Adams, brought a wrongful-death action in the circuit court of Cook County against Northern Illinois Gas Company (NI-Gas). The circuit court granted NI-Gas’ motion for summary judgment. The appellate court reversed the grant of summary judgment in favor of NI-Gas and remanded the cause for further proceedings. 333 Ill. App. 3d 215. We allowed NI-Gas’ petition for leave to appeal (177 Ill. 2d R. 315(a)), and now affirm the appellate court.

BACKGROUND

The record contains the following pertinent evidence. Since 1971, Janice Adams (decedent) resided in a house located at 1294 Greenbay Avenue in Calumet City. Decedent’s mother, Lucia Georgevich, bought the house, but decedent paid the mortgage and the utilities. Various appliances in the house, including a range, were fueled by natural gas.

On the evening of December 7, 1995, decedent arrived home, opened a door, and stepped inside. The house exploded and was engulfed in flames, causing her death.

First at the scene was the Calumet City fire department. Assistant chief Dan Smits and fire investigator Joe Ratkovich investigated the cause and origin of the explosion. Smits saw the fire and saw that the walls of the house had been blown out. He observed the body of decedent just inside what had been an entrance to the house. Smits inspected the gas meter, gas piping, and gas appliances and directed that all those items be removed and preserved.

The Calumet City fire department determined that the cause of the explosion and fire was the failure of the flexible brass gas connector that connected the kitchen range to the gas supply. The brand name of the connector was “Cobra.” Failure of the connector permitted a large amount of natural gas to escape and accumulate in the house. When decedent entered the house and turned on an electric light, a small spark from the switch ignited the gas. The Illinois State Fire Marshall, the United States Bureau of Alcohol, Tobacco and Firearms, and the private fire investigator employed by the homeowner’s insurance carrier also investigated the explosion and all agreed that it was caused by the failure of the gas connector to the range.

Plaintiff, one of decedent’s daughters, brought a wrongful-death action in a two-count, first amended complaint. Count II named NI-Gas as a defendant.
(footnote: 1) Plaintiff alleged that NI-Gas “knew that Cobra brand natural gas appliance connectors were defective and prone to failure resulting in natural gas leaks and explosions.” Plaintiff alleged that NI-Gas “had a duty to warn its customers, including plaintiff’s decedent, about the existence of Cobra brand natural gas appliance connectors and the dangers of natural gas leak, explosion and fire associated with these connectors.” Plaintiff alleged that NI-Gas breached this duty to warn in that NI-Gas: failed to provide (a) any or (b) adequate warning; (c) used an ineffective means to inform customers; (d) failed to initiate an inspection program to identify and remove Cobra brand natural gas appliance connectors from customer homes and businesses; and (e) failed to properly inspect decedent’s home “to cause the removal of the aforesaid Cobra brand connector.”

The record includes the depositions of several opinion witnesses, including Charles Lamar, Wayne Genck, Norman Breyer, and Edward Karnes. Their testimony adduced the following additional evidence.

The connector in this case was manufactured by the Cobra Hose Company, which has been out of business since 1979. Made as early as 1953, Cobra connectors were widely used in Illinois and other states. The Cobra connector essentially was a corrugated flexible brass tube with threaded brass connectors at each end that connect a gas appliance to the hard pipe gas source. The threaded connectors were telescoped and fastened to the ends of the corrugated brass tube by a process known as brazing. The compound used in the brazing process is composed of phosphorized brazing alloys containing a substantial portion of phosphorous and a high percentage of copper.

It is undisputed that natural gas, in its original state, is odorless. The chemical ethyl mercaptan, which is a sulfur component, is added as an odorant to give natural gas its distinctive smell. In addition to sulfur that is intentionally added, natural gas itself produces sulfur compounds through intrinsic chemical reactions. By law, NI-Gas is required to supply odorized gas to its customers as a safety precaution, so that customers more easily can detect a gas leak. The natural gas that NI-Gas supplied to decedent was as the law required it to be.

However, when sulfur is added to natural gas, as in the present case, a chemical reaction begins to occur between the phosphorous brazing alloy and the sulfur. This chemical reaction causes the brazed joint to corrode and deteriorate. Over time, the deterioration of the brazed joint results in its separation from the corrugated tube and the consequent release of natural gas into the home. Even the naturally occurring sulfides in the gas are sufficient to cause the brazed connector eventually to fail.

In 1968, the American National Standards Institute (ANSI)
(footnote: 2) revised its standards on gas connectors and banned phosphorous brazing. ANSI’s Z21 subcommittee on connectors is the committee that has jurisdiction over all domestic standards for natural gas ranges, furnaces, water heaters, and connectors. The Z21 specifications were modified to warn that the use of brazing compounds that contain phosphorous can result in a brittle joint and can be deadly.

The record contains evidence that NI-Gas was aware of the potential danger in homes using Cobra connectors. In May 1976, NI-Gas’ supervisor of Research Services reported to the Z21 subcommittee that the “sudden, mysterious separation of brass connectors and their brazed-on end fittings has been a concern of gas utility people for several years.” In a letter dated December 14, 1979, the United States Consumer Product Safety Commission informed the American Gas Association (AGA) that Cobra connectors allegedly caused a number of fires in homes. According to the letter, while some jurisdictions did not allow the installation of Cobra connectors, many such connectors “may still be in service, and therefore may be susceptible to creating a significant hazard to the occupants of those residences equipped with such connectors.” On December 19, the president of the AGA sent a letter to all its member companies, including NI-Gas, stating that the Commission had notified AGA that Cobra connectors had an increasing potential to fail over time.

The record also includes copies of “Consumer News” notices that NI-Gas sent to its customers. The August/September 1978, June/July 1980, summer/fall 1981, and December 1981 notices indicated that an old connector could crack, creating an unsafe condition, when the appliance was moved. The December 1981, January 1985, May 1986, and June 1987 notices warned: “The U.S. Consumer Product Safety Commission has warned that certain appliance connectors manufactured prior to 1968 may be unsafe. If you are concerned, do not try to move the appliance to inspect the connector. Instead, call a qualified service agency of NI-Gas to make the inspection.”

Also, NI-Gas knew that failed Cobra connectors were determined to have caused many explosions and fires within its service area, including Aurora, Evanston, and Rockford. In the 1970s there were a series of fires in the Village of South Holland associated with brazed connectors. Wayne Kortum, a volunteer firefighter in South Holland and a NI-Gas employee, informed NI-Gas supervisors at the Glenwood district office, the district that includes the decedent’s home, about the connectors involved with these fires. Thereafter, Kortum attended a general meeting at the Glenwood office where NI-Gas supervisors informed him and other service employees that there were problems with brazed connectors and that the service employees should look for these connectors in customers’ homes.

In November 1984, NI-Gas representatives participated in a meeting with officials from the Village of Skokie. The Skokie fire department had determined that several fires and an explosion in the Village were related to brazed connector failures. Carol Anderson, one of the NI-Gas attendees, testified that in the 1980s she was aware that brazed connectors were a hazard. According to John Agosti, a Skokie fire official, NI-Gas represented that it would notify its service and construction personnel about replacing brazed connectors. In turn, these employees would warn the NI-Gas customers with whom they came in contact.

Charles Henry, a trained NI-Gas serviceman, testified in a deposition as follows. NI-Gas instructed its service employees on the potential danger of Cobra connectors. When a NI-Gas employee encountered a brazed connector, the employee was required to tag the connector and advise the customer that the connector needed to be replaced as soon as possible.

Decedent’s ex-husband, Leonard Adams, testified in a deposition as follows. He had observed NI-Gas employees read the gas meter in the utility room of decedent’s home on occasion, but they did not examine anything in the house other than the meter. In 1978 or 1980, after having a new clothes drier installed by the appliance retailer, a gas leak was detected. Decedent telephoned NI-Gas. A NI-Gas employee came to the house and checked the gas pipe between the meter and the clothes drier. The employee discovered that the pipe was leaking and tightened it; he did not do anything else.

NI-Gas moved for summary judgment against plaintiff. NI-Gas contended that it did not owe decedent a legal duty to warn her that her Cobra connector was potentially hazardous because decedent owned the connector and not NI-Gas. The circuit court granted NI-Gas’ motion for summary judgment against plaintiff.
(footnote: 3)
 Plaintiff appealed. Initially, the appellate court, with one justice dissenting, affirmed the grant of summary judgment in favor of NI-Gas, holding that NI-Gas did not owe decedent a legal duty. However, the appellate court modified its opinion upon denial of plaintiff’s petition for rehearing. In its modified opinion, the appellate court, 
inter alia
, reversed the grant of summary judgment in favor of NI-Gas. The appellate court held, “as a matter of law, that a utility company that has actual knowledge of a dangerous condition associated with the use of its product has a responsibility to its customers to warn them of that danger.” 333 Ill. App. 3d at 224.

This court allowed NI-Gas’ petition for leave to appeal. 177 Ill. 2d R. 315(a). We subsequently granted the People’s Gas Light and Coke Company 
et al
. leave to submit an 
amicus curiae
 brief in support of NI-Gas. See 155 Ill. 2d R. 345.

ANALYSIS

This matter is before us on the grant of summary judgment in favor of NI-Gas. The purpose of summary judgment is not to try a question of fact, but rather to determine whether a genuine issue of material fact exists. 
Happel v. Wal-Mart Stores, Inc.
, 199 Ill. 2d 179, 186 (2002); 
Gilbert v. Sycamore Municipal Hospital
, 156 Ill. 2d 511, 517 (1993). Summary judgment is appropriate only where “the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” 735 ILCS 5/2–1005(c) (West 2002). 

 In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent. A triable issue precluding summary judgment exists where the material facts are disputed, or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts. The use of the summary judgment procedure is to be encouraged as an aid in the expeditious disposition of a lawsuit. However, it is a drastic means of disposing of litigation and, therefore, should be allowed only when the right of the moving party is clear and free from doubt. 
Gilbert
, 156 Ill. 2d at 518 (and cases cited therein); accord 
Espinoza v. Elgin, Joliet & Eastern Ry. Co.
, 165 Ill. 2d 107, 113-14 (1995). In appeals from summary judgment rulings, review is 
de novo
. 
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90, 102 (1992).

Plaintiff alleged negligence on the part of NI-Gas. To prevail in an action for negligence, the plaintiff must establish that the defendant owed a duty of care, that the defendant breached that duty, and that the plaintiff incurred injuries proximately caused by the breach. 
Espinoza
, 165 Ill. 2d at 114; 
Ward v. K mart Corp.
, 136 Ill. 2d 132, 140 (1990). The existence of a duty is a question of law for the court to decide; however, the issues of breach and proximate cause are factual matters for a jury to decide (
Thompson v. County of Cook
, 154 Ill. 2d 374, 382 (1993)), provided there is a genuine issue of material fact regarding those issues (
Espinoza
, 165 Ill. 2d at 114).

In this case, the sole inquiry before us concerns the existence of a legal duty. Plaintiff asserts that NI-Gas owed decedent a duty to warn her that Cobra connectors were potentially hazardous. NI-Gas denies that it had such a duty because decedent owned the connector and not NI-Gas.

There can be no recovery in tort for negligence unless the defendant has breached a duty owed to the plaintiff. 
Boyd v. Racine Currency Exchange, Inc.
, 56 Ill. 2d 95, 97 (1973); accord 
LaFever v. Kemlite Co.
, 185 Ill. 2d 380, 388 (1998). Duty is a question of whether the defendant and the plaintiff stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff. In determining whether a duty exists, a court looks to certain relevant factors, including: (1) the reasonable forseeability that the defendant’s conduct may injure another, (2) the likelihood of an injury occurring, (3) the magnitude of the burden of guarding against such injury, and (4) the consequences of placing that burden on the defendant. 
Happel
, 199 Ill. 2d at 186-87; 
Ward
, 136 Ill. 2d at 140-41; 
Kirk v. Michael Reese Hospital & Medical Center
, 117 Ill. 2d 507, 526 (1987). In support of their respective positions, the parties invoke two sources of law: (1) the common law, and (2) NI-Gas’ tariff on file with the Illinois Commerce Commission.

I. Common Law

American consumers have been using gas as fuel for illumination or heat for over a century. Courts from across the nation, including Illinois courts, long ago considered the factors in determining the existence of a duty with respect to the duties that gas distributors owe to their customers concerning escaping gas. The common law, which is always heedful of realities when it formulates rules to govern conduct (
Graham v. North Carolina Butane Gas Co.
, 231 N.C. 680, 684-85, 58 S.E.2d 757, 761 (1950)), has established the following principles.

Gas is a dangerous substance or commodity when it is not under control. 
Metz v. Central Illinois Electric & Gas Co.
, 32 Ill. 2d 446, 450 (1965); 
McClure v. Hoopeston Gas & Electric Co.
, 303 Ill. 89, 97 (1922); accord 
Suiter v. Ohio Valley Gas Co.
, 10 Ohio St. 2d 77, 78, 225 N.E.2d 792, 793 (1967); 
Bellefuil v. Willmar Gas Co.
, 243 Minn. 123, 126, 66 N.W.2d 779, 782 (1954); 
Graham
, 231 N.C. at 684, 58 S.E.2d at 761. However, a gas company is not liable as an insurer for injuries sustained as the result of the escape of gas. Rather, the company is liable for its negligence in permitting the gas to escape. 
Pappas v. Peoples Gas Light & Coke Co.
, 350 Ill. App. 541, 548 (1953); accord 
Bellefuil
, 243 Minn. at 126, 66 N.W.2d at 782; 
Graham
, 231 N.C. at 685, 58 S.E.2d at 761; 27A Am. Jur. 2d 
Energy & Power Sources
 §368, at 278 (1996); 38A C.J.S. 
Gas
 §119, at 143 (1996). Expressions of the degree of care that a gas company must exercise range from “reasonable” (see, 
e.g.
, 
Graham
, 231 N.C. at 685, 58 S.E.2d at 761) to “high” (see, 
e.g.
, 
McClure
, 303 Ill. at 97). This variety of expression simply means that a gas company must exercise a degree of care to prevent the escape of gas from its pipes commensurate with or proportional to the level of danger which it is the company’s duty to avoid. 
Metz
, 32 Ill. 2d at 450; 
Cosgrove v. Commonwealth Edison Co.
, 315 Ill. App. 3d 651, 654-55 (2000); accord 
Lewis v. Vermont Gas Corp.
, 121 Vt. 168, 182, 151 A.2d 297, 306 (1959); 
Doxstater v. Northwest Cities Gas Co.
, 65 Idaho 814, 826-27, 154 P.2d 498, 504 (1944); 
Bellefuil
, 243 Minn. at 126, 66 N.W.2d at 782; 27A Am. Jur. 2d 
Energy & Power Sources
 §373, at 281 (1996); 38A C.J.S. 
Gas
 §120, at 145-46 (1996); L. Tellier, Annotation, 
Liability of Gas Co. for Injury or Damage Due to Defects in Service Lines on Consumer’s Premises
, 26 A.L.R.2d 136, 146 (1952).

While a gas company must exercise the requisite degree of care so that no injury occurs in the distribution of gas while it is under the company’s control, such responsibility is limited to the time the gas is in the company’s own pipes. 
Doxstater
, 65 Idaho at 827, 154 P.2d at 504 (collecting cases). In Illinois, the seminal example of the common law rule pertaining to gas distribution in a consumer’s pipes and fixtures is 
Clare v. Bond County Gas Co.
, 356 Ill. 241 (1934).

In 
Clare
, the plaintiff opened a shop and hired a plumber to install a gas stove for heat. After the installation, she noticed an offensive odor that irritated her eyes and gave her a headache. She notified the gas company. The president of the gas company visited the shop several times and made suggestions to remedy the situation. His suggestions were followed, but the problem continued. The smell was so strong in the closet where the gas meter was located that the plaintiff kept the door to the closet closed. Several weeks after the unsuccessful attempts to locate the source of the problem, a friend of the plaintiff was looking for a screwdriver. He lit a match to help him look for it in the dark closet. He opened the closet door and an explosion occurred. It was subsequently discovered that the gas pipe that ran beneath the floor contained holes caused by rust. The gas that escaped from the pipe had accumulated in the closet. 
Clare
, 356 Ill. at 241-43. Appealing a judgment in favor of plaintiff, the gas company contended that “there was no evidence in the record to warrant the finding that it [the gas company] had notice and knowledge that the pipes were leaking and gas was escaping into the building; that without such notice or knowledge there was no duty incumbent upon it to shut off the gas supply.” 
Clare
, 356 Ill. at 243.

Reversing the judgment in favor of plaintiff, 
Clare
 relied on established common law: “In the absence of notice of defects it is not incumbent upon a gas company to exercise reasonable care to ascertain whether or not service pipes under the control of the property owner or the consumer are fit for the furnishing of gas.” 
Clare
, 356 Ill. at 244. Where a gas company does not install the pipes or fixtures on a customer’s premises, and does not own them and has no control over them, the company is not responsible for their condition or for their maintenance, and as a result is not liable for injuries caused by a leak therein of which the company had no knowledge. 
Clare
, 356 Ill. at 244 (collecting cases). 
Clare
 looked to the common law as evolved up to that time and today continues to accord with our understanding of the common law rule. Accord 
Oliver v. Peoples Gas Light & Coke Co.
, 5 Ill. App. 3d 1093, 1099 (1972); accord 
Bellefuil
, 243 Minn. at 126, 66 N.W.2d at 782 (discussing rule in context of gas appliances); 
Doxstater
, 65 Idaho at 827-28, 154 P.2d at 504, quoting 
Kelley v. Public Service Co. of Northern Illinois
, 300 Ill. App. 354, 362 (1939); 27A Am. Jur. 2d 
Energy & Power Sources
 §§394, 395 (1996) (stating rule in context of appliances); 27A Am. Jur. 2d 
Energy & Power Sources
 §403 (1996) (stating general rule); 38A C.J.S. 
Gas
 §123, at 151-53 (1996); 26 A.L.R.2d at 156.

Courts reason that a person’s duty can extend no further than the person’s right, power, and authority to implement it. Gas company employees do not have the right to enter the premises of their customers to inspect pipes or fixtures except upon the license or permission of the owner. 
Clare
, 356 Ill. at 244. The consumer, by application for gas service, assumes the burden of inspecting and maintaining the pipes and fittings on the consumer’s property in a manner reasonably suited to meet the required service. The company has the right to assume that the customer’s interior system of pipes and fittings is sufficiently secure to permit the gas to be introduced with safety. 
Clare
, 356 Ill. at 244-45 (collecting cases); accord 
Bellefuil
, 243 Minn. at 126-27, 66 N.W.2d at 782-83; 
Graham
, 231 N.C. at 685, 58 S.E.2d at 761; 
Moran Junior College v. Standard Oil Co. of California
, 184 Wash. 543, 552, 52 P.2d 342, 346 (1935); 27A Am. Jur. 2d 
Energy & Power Sources
 §403 (1996).

Courts also reason that, in a negligence action, knowledge of the facts out of which the duty to act arises is essential. In order that an act or omission may be regarded as negligent, the defendant must have knowledge, or ought to have known from the circumstances, that the allegedly negligent act or omission endangered another. 
Weber v. Interstate Light & Power Co.
, 268 Wis. 479, 482, 68 N.W.2d 39, 41 (1955). Accordingly, the common law rule of no duty of a gas company with respect to a consumer’s pipes or fittings is premised on the gas company’s lack of knowledge or notice of a gas leak. See, 
e.g.
, 
Clare
, 356 Ill. at 244 (stating rule with proviso of gas company’s lack of knowledge or notice); 
Bellefuil
, 243 Minn. at 129, 66 N.W.2d at 784 (“the duty, by reason of actual or constructive notice of some dangerous condition, must arise before the gas company can be found negligent for its failure to inspect or shut off the gas supply”).

Considering the requirement of the gas company’s knowledge or notice of a gas leak, the exception to the common law rule is evident:

“Where it appears that a gas company has knowledge that gas is escaping in a building occupied by one of its consumers it becomes the duty of the gas company to shut off the gas supply until the necessary repairs have been made although the defective pipe or apparatus does not belong to the company and is not in its charge or custody.” 
Clare
, 356 Ill. at 243-44.

Accord 
Graham
, 231 N.C. at 685, 58 S.E.2d at 761-62 (citing 
Clare
); 27A Am. Jur. 2d 
Energy & Power Sources
 §413, at 309-10 (1996); 38A C.J.S. 
Gas
 §123, at 153-54 (1996); 26 A.L.R.2d at 150. In the specific context of gas appliances, courts have gone so far as to impose on a gas company that has knowledge of a gas leak a duty to inspect:

“[W]henever a gas company is in possession of facts that would suggest to a person of ordinary care and prudence that an appliance of a customer is leaking or is otherwise unsafe for the transportation of gas, the company has a duty to investigate, as a person of ordinary care and prudence similarly situated and handling such a dangerous substance would do, before it continues to furnish additional gas. The duty to exercise reasonable diligence to inspect or shut off the gas supply is measured by the likelihood of injury. Circumstances may be such as to require a gas company to investigate immediately and shut off the gas supply until repairs are made. The nature of the notice may also affect the extent of inspection necessary.” 
Bellefuil
, 243 Minn. at 128-29, 66 N.W.2d at 783-84.

It is clear that the knowledge that would impose on a gas company this duty is not limited to actual knowledge, but may include constructive knowledge or notice. It is sufficient if the gas company received facts which would have made the defects known to an ordinary prudent person. For example, 
Clare
 was rendered in the context of the gas company’s denial of “notice 
or
 knowledge.” (Emphasis added.) 
Clare
, 356 Ill. at 243. Further, this court expressly–and correctly–stated the common law rule with the accepted proviso of a gas company’s lack of knowledge (
Clare
, 356 Ill. at 243 (“Where it appears that a gas company has knowledge”)) or notice (
Clare
, 356 Ill. at 244 (“In the absence of notice”)). See 
Mrdalj v. Public Service Co. of Northern Illinois
, 308 Ill. App. 424, 430 (1941); 
Kelley
, 300 Ill. App. at 362; 
Kilmer v. Browning
, 806 S.W.2d 75, 83 (Mo. App. 1991); 
Ruberg v. Skelly Oil Co.
, 297 N.W.2d 746, 751 (Minn. 1980); 
Fore v. United Natural Gas Co.
, 436 Pa. 499, 504-05, 261 A.2d 316, 318-19 (1970); 
Bellefuil
, 243 Minn. at 128-29, 66 N.W.2d at 783-84.

Further, 
Clare
 was directed not only to actual gas leaks, but also to defects. 
Clare
, 356 Ill. at 244 (“In the absence of notice of 
defects
” (emphasis added)). “The rule in Illinois as to the liability of a gas company is such company is responsible for a customer’s pipe if it has knowledge of a leak 
or of a possible defect therein
.” (Emphasis added.) 
Oliver
, 5 Ill. App. 3d at 1099; accord 
Bellefuil
, 243 Minn. at 128-29, 66 N.W.2d at 783-84 (speaking of a customer’s gas appliance that “is leaking 
or is otherwise unsafe
 for the transportation of gas” (emphasis added)); 27A Am. Jur. 2d 
Energy & Power Sources
 §413, at 310 (1996) (stating “that if a gas company has notice of a leak or 
defect in pipes or lines owned or controlled by a consumer
, it is under a duty to notify the consumer and see that the leak or defect is repaired, or shut off the gas”).

This common law rule and corresponding exception serve the concept that a gas company is not an insurer for any injury sustained as a result of escaping gas, but rather is liable only for its negligence. “To apply any other rule would make the gas supplier an insurer if anything went wrong with any of the appliances over which it had no control.” 
Wilson v. Home Gas Co.
, 267 Minn. 162, 172, 125 N.W.2d 725, 732 (1964).

As the appellate court in this case recognized, Illinois courts have not addressed a gas company’s duty to warn its customers of the possible deterioration of the customer’s fixtures when they are damaged, in part, due to the gas product itself. 333 Ill. App. 3d at 220. However, addressing the same facts as in this case, two decisions from other jurisdictions recognize that gas companies who have notice of the danger caused by sulfides in their gas coming in contact with brazed connectors owe common law tort duties: 
Lemke v. Metropolitan Utilities District
, 243 Neb. 633, 502 N.W.2d 80 (1993), and 
Halliburton v. Public Service Co. of Colorado
, 804 P.2d 213 (Colo. App. 1990). We agree with the appellate court that these cases are instructive. 333 Ill. App. 3d at 220-22.

In 
Lemke
, a gas explosion destroyed the home of Lorraine and Kenneth Lemke and severely injured Lorraine. 
Lemke
, 243 Neb. at 634-37, 502 N.W.2d at 82-84. The trial court found that the cause of the explosion was a Cobra connector, which failed due to the interaction of the phosphorous brazing alloy and the gas. Although there was evidence that the Metropolitan Utilities District (MUD) installed thousands of Cobra connectors in the homes of MUD customers, there was no evidence that MUD installed the Cobra connector to the plaintiff’s gas range. The court entered judgment in favor of plaintiffs. 
Lemke
, 243 Neb. at 642, 502 N.W.2d at 86.

Appealing from the judgment, MUD contended “that it had no duty to notify its customers concerning a potential hazard from Cobra connectors, especially a customer who may not have purchased the connector from MUD.” 
Lemke
, 243 Neb. at 648, 502 N.W.2d at 90. The Nebraska Supreme Court rejected this contention.

The 
Lemke
 court reviewed its past statements of the earlier-discussed common law principles. The court concluded:

“Because a gas company has a nondelegable duty to exercise due care regarding natural gas supplied to a customer, a gas company’s duty of care not only pertains to the company’s distribution of gas through its pipelines, but extends to distribution through a customer’s service line or gas appliance that the company knows, or should know, is unsafe for conducting or using gas.” 
Lemke
, 243 Neb. at 651, 502 N.W.2d at 91.

The court noted, as the record in this case shows, that the American Gas Association warned all of its members, including MUD, that Cobra connectors presented a danger in the distribution of natural gas. The court reasoned:

“When MUD received information about the dangerous condition or potential hazard involving Cobra connectors but did not disseminate this critical information to its customers who were using gas appliances with Cobra connectors, MUD effectively exerted control in a situation that could eventually culminate in injury to customers who continued to use gas supplied by MUD.” 
Lemke
, 243 Neb. at 648, 502 N.W.2d at 89.

 According to the court, that information

“placed MUD on notice that its customers who had gas appliances with Cobra connectors would be endangered when the connector separated from a gas service line or appliance. Consequently, when MUD became aware that the distribution of gas through a Cobra connector presented a risk of injury to customers, MUD had the duty to use due care, such as issuance of a warning, to protect customers ***.” 
Lemke
, 243 Neb. at 652, 502 N.W.2d at 92.

As in 
Lemke
, NI-Gas’ superior knowledge of the risks pertaining to Cobra connectors begat a duty of due care, such as issuing a warning to its customers.

In 
Halliburton
, the Public Service Company of Colorado, similar to NI-Gas here, knew at least since the 1970s that a large number of brazed connectors failed because of the interaction of the brazed connector and the sulfides in the gas. The court cited four reasons to impose a duty on the gas company to inspect plaintiff’s brazed connector: (1) the relatively insignificant amount of time and expense that defendant would have expended to evaluate the connector and take corrective action; (2) two service calls at plaintiff’s home after the gas company knew of this hazard, which affected approximately 45,000 homes in the Denver area; (3) the likelihood of the connector failing and possibly causing an explosion unless corrective action were taken; and (4) defendant’s expertise in dealing with such problems. The court continued: “The most compelling reason, however, for imposing a duty upon defendant is that its product, natural gas, which contained the corrosive ethyl mercaptan, was a substantial factor in 
causing
 the deterioration of the connector tube.” (Emphasis in original.) 
Halliburton
, 804 P.2d at 216.

At oral argument, plaintiff expressly clarified that the extent of NI-Gas’ duty of reasonable care in this case should be to warn its customers of the dangers presented by its gas coming in contact with the brazed connectors. Thus, while no issue exists in this case regarding a duty to inspect every connector, we agree with the following from 
Halliburton
: “When a party can reasonably foresee that its product will be used as an integral component of a defective and unreasonably dangerous product, there is a duty upon that party to undertake corrective action to alleviate, if possible, the hazard.” 
Halliburton
, 804 P.2d at 216. The duty is simply to use reasonable care in dealing with the hazard, including a duty to warn. 
Halliburton
, 804 P.2d at 216-17. We agree with the appellate court that, “while not controlling, 
Halliburton
 is also instructive.” 333 Ill. App. 3d at 222.

Halliburton
 and 
Lemke
 acknowledged the common law rule of a gas company’s lack of duty toward a customer’s equipment absent knowledge of a defect, but recognized that the gas suppliers in those cases had knowledge of the danger of their product being in contact with brazed connectors. Those cases also noted that the danger in question was not one normally associated with the product and consumers were not in a position to be aware of the danger without adequate warnings. Since the gas companies helped create the danger and had superior knowledge of the hazard, they owed a responsibility to their customers with respect to that danger.

We consider 
Halliburton
 and 
Lemke
 to represent a reasoned adaptation of the common law to address the exigency presented by brazed connectors. We recognize that “[t]he growth and adaptation of the common law to our contemporary concerns should not impose impractical burdens or impossible duties.” 
Hensley v. Montgomery County
, 25 Md. App. 361, 367, 334 A.2d 542, 545-46 (1975). However, it is equally clear that “[r]easonable care is not a standard beyond the reach of any enterprise.” 
Weinberg v. Dinger
, 106 N.J. 469, 494, 524 A.2d 366, 379 (1987).

In the present case, as in 
Halliburton
 and 
Lemke
, there is no dispute that NI-Gas had actual knowledge of the danger. NI-Gas knew that sulfides in the gas corroded brazed connectors, ultimately causing the connectors to leak gas; it was only a question of when the connector would fail. Based on its superior knowledge and the fact that it helped to create the dangerous condition, we hold that NI-Gas owed a common law duty of reasonable care with respect to the brazed connectors. 

This holding is directed exclusively to the element of duty and is limited to the evidence contained in the present record. We repeat plaintiff’s clarification at oral argument that NI-Gas’ duty of reasonable care in this case consists only of warning and not inspection. We express no opinion as to the adequacy of NI-Gas’ conduct in this case. It is for the trier of fact to determine whether NI-Gas’ conduct met the standard of care required of it under the circumstances. Based on our disposition of this issue, we do not discuss other tort theories raised by the parties.

II. Tariff

NI-Gas and supporting 
amici
 contend that NI-Gas’ tariff on file with the Illinois Commerce Commission “is the sole source” of its duties to its customers. NI-Gas points to the following provision of its tariff on file with the Commission at the time of the explosion:

“Equipment Furnished and Maintained by Customer.

All gas utilization equipment, piping, and vents furnished by the Customer shall be suitable for the purposes hereof and shall be installed and maintained by the Customer at all times in accordance with accepted practice and in conformity with requirements of public health and safety, as set forth by the properly constituted authorities and by the Company.

The Company assumes no responsibility in connection with the installation, maintenance or operation of the Customer’s equipment and reserves the right to discontinue service if such equipment is in unsatisfactory condition.”

NI-Gas contends that the plain language of this provision bars imposition of a duty in this case.

A tariff is a public document setting forth services being offered; rates and charges with respect to services; and governing rules, regulations, and practices relating to those services. 
North River Insurance Co. v. Jones
, 275 Ill. App. 3d 175, 185 (1995). The Public Utilities Act requires public utilities such as NI-Gas to file tariffs with the Illinois Commerce Commission. 220 ILCS 5/9–102 (West 1994). A tariff is usually drafted by the regulated utility, but when duly filed with the Commission, it binds both the utility and the customer and governs their relationship. See 
Danisco Ingredients USA, Inc. v. Kansas City Power & Light Co.
, 267 Kan. 760, 765, 986 P.2d 377, 381 (1999). Once the Commission approves a tariff, it “is a law, not a contract, and has the force and effect of a statute.” 
Illinois Central Gulf R.R. Co. v. Sankey Brothers, Inc.
, 67 Ill. App. 3d 435, 439 (1978), 
aff’d
, 78 Ill. 2d 56 (1979).

Illinois law in this area originates in federal law. In 
Western Union Telegraph Co. v. Esteve Brothers. & Co.
, 256 U.S. 566, 571-72, 65 L. Ed. 1094, 1097-98, 41 S. Ct. 584, 586 (1921), the United States Supreme Court considered the legal effect of tariffs filed pursuant to the Interstate Commerce Act:

“The Act of 1910 [36 Stat. 539, 544] introduced a new principle into the legal relations of the telegraph companies with their patrons which dominated and modified the principles previously governing them. Before the act the companies had a common-law liability from which they might or might not extricate themselves according to views of policy prevailing in the several states. Thereafter, for all messages sent in interstate or foreign commerce, the outstanding consideration became that of uniformity and equality of rates. Uniformity demanded that the rate represent the whole duty and the whole liability of the company. It could not be varied by agreement; still less could it be varied by lack of agreement. The rate became, not as before a matter of contract by which a legal liability could be modified, but a matter of law by which a uniform liability was imposed.”

Accord 
In re Illinois Bell Switching Station Litigation
, 161 Ill. 2d 233, 249 (1994) (Miller, J., specially concurring); 
J. Meyer & Co. v. Illinois Bell Telephone Co.
, 88 Ill. App. 3d 53, 57 (1980) (both citing 
Esteve Brothers
, 256 U.S. 566, 65 L. Ed. 1094, 41 S. Ct. 584).

The United States Supreme Court has described the federal filed-rate doctrine as follows: “ ‘The rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier.’ ” 
American Telephone & Telegraph Co. v. Central Office Telephone, Inc.
, 524 U.S. 214, 227, 141 L. Ed. 2d 222, 236, 118 S. Ct. 1956, 1965 (1998), quoting 
Keogh v. Chicago & Northwestern Ry. Co.
, 260 U.S. 156, 163, 67 L. Ed. 183, 187, 43 S. Ct. 47, 49 (1922). The filed-rate doctrine serves two goals: prevention of price discrimination among rate payers, and preservation of the role of regulatory agencies in deciding reasonable rates for public utilities and services. 
Fax Telecommunicaciones, Inc. v. AT&T
, 138 F.3d 479, 489 (2d Cir. 1998); 
Wegoland Ltd. v. NYNEX Corp.
, 27 F.3d 17, 19 (2d Cir. 1994); 
Qwest Corp v. Kelly
, 204 Ariz. 25, 35, 59 P.3d 789, 799 (2002) (and cases cited therein); 
Lovejoy v. AT&T Corp.
, 92 Cal. App. 4th 85, 99, 111 Cal. Rptr. 2d 711, 721 (2001).

Tariff provisions, such as Ni-Gas’ tariff, are usually referred to as liability limitations. See, 
e.g.
, 
Illinois Bell Switching Station Litigation
, 161 Ill. 2d at 247 (Miller, J., specially concurring); 
Danisco
, 267 Kan. at 768, 986 P.2d at 383. Liability limitations reflect: the status of public utilities as regulated monopolies whose operations are subject to extensive restrictions; the requirements of uniform, nondiscriminatory rates; and the goal of universal service, achieved through the preservation of utility prices that virtually all customers can afford. 
Illinois Bell Switching Station
, 161 Ill. 2d at 249 (Miller, J., specially concurring). The underlying theory of liability limitations is that, because a public utility is strictly regulated, its liability should be defined and limited so that it may be able to provide service at reasonable rates. A reasonable rate is in part dependent on a rule limiting liability. 
Illinois Bell Switching Station
, 161 Ill. 2d at 244-46 (and cases cited therein); 
Danisco
, 267 Kan. at 769, 986 P.2d at 384 (collecting cases). The goal is “to secure reasonable and just rates for all without undue preference or advantage to any. Since that end is attainable only by adherence to the approved rate, based upon an authorized classification, that rate ‘represents the whole duty and the whole liability of the company.’ ” 
Western Union Telegraph Co. v. Priester
, 276 U.S. 252, 259, 72 L. Ed. 555, 565, 48 S. Ct. 234, 235 (1928), quoting 
Esteve Brothers
, 256 U.S. at 572, 65 L. Ed. at 1097, 41 S. Ct. at 586.

To be sure, in an action for negligence, the issue of a legal duty is generally distinguished from the issue of liability for breach of that duty. See, 
e.g.
, 
Thompson
, 154 Ill. 2d at 382. However, a “plaintiff cannot prevail against a defendant who is under no duty and equally cannot prevail against a defendant who is immune and to that extent the two concepts are the same.” 1 D. Dobbs, Law of Torts §225, at 576 (2001). Illinois courts have long held that a tariff provision such as the one at issue in this case provides the source for, and determines the nature and extent of, a public utility’s service obligations to its customers. 
Illinois Bell Switching Station
, 161 Ill. 2d at 248 (Miller, J., specially concurring); 
J. Meyer & Co.
, 88 Ill. App. 3d at 55; 
Sarelas v. Illinois Bell Telephone Co.
, 42 Ill. App. 2d 372, 374-75 (1963).

“Nonetheless, all state law causes of action are not necessarily precluded.” 
Pink Dot, Inc. v. Teleport Communications Group
, 89 Cal. App. 4th 407, 416, 107 Cal. Rptr. 2d 392, 398 (2001). As explained in 
Adamson v. Worldcom Communications, Inc.
, 190 Or. App. 215, 222, 78 P.3d 577, 582 (2003):

“The filed-rate doctrine bars only an action that seeks to vary the terms of an applicable tariff. [Citation.] Thus, the effect of a tariff on a particular claim depends on the nature of the claim and the specific terms of the tariff. If the claim is one that implicates the provisions of a tariff, then the tariff controls according to its terms, which may either limit relief available or bar a claim entirely. But if the claim is unrelated to the tariff, then the claim is not limited or barred. In other words, merely because a tariff exists does not necessarily mean that a claim is barred.”

In the context of the federal filed-rate doctrine, we are reminded: “In order for the filed rate doctrine to serve its purpose, therefore, it need pre-empt only those suits that seek to alter the terms and conditions provided for in the tariff.” 
Central Office
, 524 U.S. at 229, 141 L. Ed. 2d at 237, 118 S. St. at 1966 (Rehnquist, C.J., concurring). Further:

“The tariff does not govern *** the entirety of the relationship between the common carrier and its customers. For example, it does not affect whatever duties state law might impose ***. The filed rate doctrine’s purpose is to ensure that the filed rates are the exclusive source of the terms and conditions by which the common carrier provides to its customers the services covered by the tariff. It does not serve as a shield against all actions based in state law.” 
Central Office
, 524 U.S. at 230-31, 141 L. Ed. 2d at 238, 118 S. Ct. at 1966-67 (Rehnquist, C.J., concurring).

Illinois law accords with this reasoning.

In 1921, the General Assembly enacted the Public Utilities Act (Ill. Rev. Stat. 1921, ch. 111⅔, par. 1 
et seq
.). This court has described the legislative intent of the Act as follows:

“The Public Utilities Act [citation], under which the Commerce Commission regulates all public utilities, was enacted to assure the provision of efficient and adequate utility service to the public at a reasonable cost. Because unrestrained competition prior to adoption of the Act had often resulted in the financial failure of many utilities, the Act adopted a policy of regulated monopoly to assure that utilities would be able to earn a reasonable rate of return on their investment and thus would be able to provide the required service.” 
Local 777, DUOC, Seafarers International Union of North America v. Illinois Commerce Comm’n
, 45 Ill. 2d 527, 535 (1970) (and cases cited therein).

This court also has observed: “it cannot be doubted that the Public Utilities Act supersedes the common law liability of the carrier 
so far as rates and unreasonable discrimination are concerned
.” (Emphasis added.) 
Terminal R.R. Ass’n of St. Louis v. Public Utilities Comm’n
, 304 Ill. 312, 317 (1922). This court recognized: “ ‘The law is well settled in this State that the matter of rate regulation is essentially one of legislative control. The fixing of rates is not a judicial function ***.’ ” 
Illinois Bell Telephone Co. v. Illinois Commerce Comm’n
, 55 Ill. 2d 461, 469-70 (1973), quoting 
Produce Terminal Corp. v. Illinois Commerce Comm’n ex rel. Peoples Gas Light & Coke Co.
, 414 Ill. 582, 589 (1953).

However, this court in 
Pioneer Hi-Bred Corn Co. of Illinois v. Northern Illinois Gas Co.
, 61 Ill. 2d 6 (1975), applied the established common law duty analysis as explained in 
Clare
 to the defendant utility, which is the same defendant utility in this case. 
Pioneer Hi-Bred
, 61 Ill. 2d at 12-14. In 
Pioneer Hi-Bred
, plaintiff customer brought an action against NI-Gas to recover damages for an explosion and fire due to the failure of plaintiff’s gas-fueled equipment. Plaintiff alleged, 
inter alia
, common law negligence. The trial court refused plaintiff’s proffered jury instruction that NI-Gas was negligent in that it failed to inspect the plaintiff’s equipment. The jury found for NI-Gas. The appellate court reversed, holding that the trial court erred in refusing plaintiff’s proffered jury instruction. This court reversed the appellate court and affirmed the judgment in favor of NI-Gas. Citing 
Clare
, this court held that NI-Gas did not have a duty to inspect plaintiff’s equipment and, therefore, plaintiff’s proffered instruction was erroneous. 
Pioneer Hi-Bred
, 61 Ill. 2d at 13-14.

We presume that the court in 
Pioneer Hi-Bred
 was not unaware of the federal filed-rate doctrine as explained in the above-cited 
Priester
 and 
Esteve Brothers
 decisions from the United States Supreme Court. Additionally, according to NI-Gas, the tariff at issue in this case has been on file with the Commission “[s]ince at least 1955.”

However, despite this court’s prior decisions interpreting the Public Utilities Act and recognizing that rate regulation is not a judicial function, despite prior decisions from the United States Supreme Court establishing the federal filed-rate doctrine, and despite the existence of the 
specific tariff in this case
, this court applied the established common law duty analysis to NI-Gas. Neither this court nor NI-Gas believed that this tariff precluded a common law analysis in a negligence action for personal injury.

Similarly, this court in 
Metz
 applied the common law doctrine of 
res ipsa loquitur
 to the defendant utility. 
Metz
, 32 Ill. 2d at 448-52. Why did the appellate court and this court in each of these cases fail to mention the Public Utilities Act, the filed-rate doctrine, or any particular tariff? Because Illinois courts have recognized that where a utility tariff speaks to a specific duty, the tariff may be controlling; however, where the tariff does not address a particular situation, the common law applies and a common law duty analysis must be applied. 

For example, in 
Sarelas
, the defendant telephone company, due to a clerical error, disconnected one of the extensions of the plaintiff’s office telephone for 2½ hours. The plaintiff sued the telephone company and its president for damages, alleging that defendant owed him a duty of continuing service, and that defendant violated this duty by interrupting service. The trial court dismissed plaintiff’s complaint. 
Sarelas
, 42 Ill. App. 2d at 373-74.

On appeal, the appellate court held that the defendant’s duty to plaintiff was based on the tariff that the defendant filed with the Illinois Commerce Commission. In so holding, the court reasoned:

“[T]he extent to which defendants owed plaintiff ‘a legal duty’ is determined by the particular provisions of the tariff on file with the commission; there is no contract in this case on which plaintiff can rely, 
nor are his allegations of a breach of duty sufficient to constitute a claim in tort.
 He complains simply of the disconnection of his telephone extension, and claims a breach of duty which arises either from the tariff or not at all.” (Emphasis added.) 
Sarelas
, 42 Ill. App. 2d at 375.

In 
Sarelas
, since the plaintiff could not plead a breach of duty sufficient to constitute a claim in tort, his duty was defined by the tariff. 
Sarelas
 clearly leaves open the existence of common law duties had the plaintiff been able to plead them.

More recently, in 
Cosgrove
, our appellate court, applying a common law analysis, reinstated negligence and 
res ipsa loquitur
 counts against Ni-Gas. 
Cosgrove
, 315 Ill. App. 3d at 654-57. The court concluded: “NI-Gas is ‘subject to liability in tort’ ” pursuant to section 2 of the Joint Tortfeasor Contribution Act. 
Cosgrove
, 315 Ill. App. 3d at 658, quoting 740 ILCS 100/2 (West 1998).

Indeed, Illinois case law reveals that Illinois courts have long applied common law principles to defendant utilities subsequent to the 1921 enactment of the Public Utilities Act and despite the existence of tariffs filed with the Illinois Commerce Commission. See, 
e.g.
, 
Metz
, 32 Ill. 2d 446; 
Clare
, 356 Ill. 241; 
Cosgrove
, 315 Ill. App. 3d 651; 
Oliver
, 5 Ill. App. 3d 1093; 
Mrdalj
, 308 Ill. App. 3d 424. Thus, whether NI-Gas’ tariff bars plaintiff’s cause of action depends on the nature of plaintiff’s lawsuit and the meaning of the tariff’s language.

In this case, NI-Gas contends that the appellate court’s decision “cannot stand” in light of 
Illinois Bell Switching Station
. We disagree, finding that case to be distinguishable. In 
Illinois Bell Switching Station
, a telephone switching station caught fire, allegedly due to the negligent or willful failure of Illinois Bell to take fire prevention measures. The fire left many customers without telephone service for about a month. The customers filed a class action to seek to recover economic losses incurred due to that loss of service. Illinois Bell argued that its filed tariff defined the limits of its liability for interruptions in service. The class plaintiffs contended that the tariff should not bar their claims because the tariff was against public policy and conflicted with provisions of the Public Utilities Act. 
Illinois Bell Switching Station
, 161 Ill. 2d at 242-43.

In holding that the tariff controlled in that case, this court found no duty on which to base the class plaintiffs’ claims. This court initially noted that Illinois Bell was nowhere charged with the duty to provide completely uninterrupted service. Rather, its duty was to provide adequate, efficient, and reliable service, which is not tantamount to infallible service. Temporary disruptions may occur without reducing Bell’s service to a level less than adequate, efficient, or reliable. Further, this court held that the exculpatory language in Bell’s tariff properly limited claims from disruption of service to a rebate of the costs for the missed service, and concluded that the tariff’s provision, which limited Bell’s liability in the event of a service disruption, was not contrary to the Act. 
Illinois Bell Switching Station
, 161 Ill. 2d at 243-44.

Unlike 
Illinois Bell Switching Station
, where no duty existed on the part of Illinois Bell, we have concluded in this case that NI-Gas owed a duty to plaintiff. Further, in 
Illinois Bell Switching Station
, the class plaintiffs contended that the tariff applied, but conflicted with the Public Utilities Act. However, in this case, plaintiff contends that NI-Gas’ tariff, as written, does not apply to her claim, an issue that was never addressed in 
Illinois Bell Switching Station
.

Turning to the NI-Gas tariff provision in this case, it is evident that the tariff essentially codifies the common law rule that a gas company has no duty with respect to a consumer’s gas pipes and fittings, based on the consumer’s responsibility for maintaining his or her own equipment and the company’s lack of control and knowledge. See, 
e.g.
, 
Clare
, 356 Ill. at 243-45 (stating common law rule). However, NI-Gas contends that the tariff provision eliminates the common law 
exception
 to this rule. According to NI-Gas, the tariff provision absolves it from any duty with respect to a consumer’s pipes and equipment even if it has knowledge that a customer’s appliance is leaking or is otherwise unsafe for the transportation of gas. See, 
e.g.
, 
Bellefuil
, 243 Minn. at 128-29, 66 N.W.2d at 783-84 (stating common law exception).

We agree with the appellate court’s rejection of this contention. 333 Ill. App. 3d at 223. Ni-Gas’ position is untenable for several reasons.

Initially, allowing this cause of action to proceed would not contravene the above-stated policies underlying liability limitations. Plaintiff is not seeking rate preferences that are not accorded to other NI-Gas customers; she is not seeking to enforce “side agreements” which vary from our interpretation of the tariff. Rather, if proved, awarding damages on plaintiff’s claim would neither discriminate against other NI-Gas customers nor involve the court in tariff setting. See, 
e.g.
, 
Lovejoy
, 92 Cal. App. 4th at 101, 111 Cal. Rptr. 2d at 723; 
Day v. AT&T Corp.
, 63 Cal. App. 4th 325, 336, 74 Cal. Rptr. 2d 55, 62 (1998).

“Although a utility tariff is not a legislative enactment, its interpretation is governed by the rules of statutory construction.” 
Bloom Township High School v. Illinois Commerce Comm’n
, 309 Ill. App. 3d 163, 174 (1999); accord 
Danisco
, 267 Kan. at 772, 986 P.2d at 385. The cardinal rule of interpreting statutes, to which all other canons and rules are subordinate, is to ascertain and give effect to the intent of the legislature. 
McNamee v. Federated Equipment & Supply Co.
, 181 Ill. 2d 415, 423 (1998); 
Illinois Bell Switching Station
, 161 Ill. 2d at 246. Although a court should first consider the statutory language, a court must presume that the legislature, in enacting a statute, did not intend absurdity or injustice. 
McNamee
, 181 Ill. 2d at 423-24; 
State Farm Fire & Casualty Co. v. Yapejian
, 152 Ill. 2d 533, 540-41 (1992); 
Illinois Crime Investigating Comm’n v. Buccieri
, 36 Ill. 2d 556, 561 (1967). “A statute or ordinance must receive a sensible construction, even though such construction qualifies the universality of its language.” 
Illinois Bell Switching Station
, 161 Ill. 2d at 246.

Specifically, as earlier noted, rate regulation is one of legislative control and is not a judicial function. Therefore, the right to review the conclusion of the Commission acting under authority delegated by the legislature is accordingly limited. This deference to the judgment of the Commission is especially appropriate in the area of setting rates. 
Illinois Bell
, 55 Ill. 2d at 469-70 (and cases cited therein).

Applying these principles to the tariff provision at issue in this case, we conclude that the Commission did not intend to completely immunize NI-Gas with respect to a gas leak of which it has notice. It must be remembered:

“Public utilities do not enjoy a general tort immunity; they owe a duty of care to the general public. Thus, if a utility company recognizes that its conduct under certain circumstances creates an unreasonable risk of harm to another, it has a duty to take reasonable precautions to prevent that risk of harm from occurring.” 64 Am. Jur. 2d 
Public Utilities
 §14, at 456 (2001).

Remembering that gas is a dangerous substance and commodity (
Metz
, 32 Ill. 2d at 450; 
McClure
, 303 Ill. at 97), the far-reaching consequences of NI-Gas’ interpretation of this tariff provision are readily apparent. In effect, NI-Gas argues that if it had omitted language regarding duty and liability from its tariff, it would owe no duty whatsoever to anyone under any circumstances. The Commission’s own decisions and orders belie such an unreasonable contention. See 
Nordine v. Illinois Power Co.
, 32 Ill. 2d 421, 428 (1965) (observing that orders and decisions of the Illinois Commerce Commission are public records “and as such we take judicial notice of them”).

For example, in 
Citizens Utilities Co. of Illinois
, No. 94–0481 (Illinois Commerce Comm’n September 13, 1995), the utility company (CUCI) filed with the Commission a revised tariff which proposed, 
inter alia
, changes to its conditions of service. Regarding one such condition, the Commission observed: “CUCI proposes sweeping language for its fire protection service which would absolve it from any liability for damages of any nature to persons or property caused by fire. The Commission agrees with Staff’s criticism of this proposal.”

Indeed, the Commission has rejected the very argument that NI-Gas makes before this court. In 
Teleport Communications Group, Inc.
, No. 96–AB–001 (Illinois Commerce Comm’n November 4, 1996), Teleport Communications Group, Inc. (TCG), filed a petition for arbitration with the Commission, seeking arbitration of the disputed portions of an interconnection agreement with Ameritech.

One disputed provision in the agreement required each party to indemnify the other against losses suffered by customers of the ultimate service provider. Ameritech’s proposal would require Ameritech and TCG each to limit its liability, in the event of a transmission delay or defect, to an amount equivalent to the proportionate charge to the end user customer for the period of service during which the delay or defect occurred.

TCG responded that it should not be required to include a limitation of liability provision in contracts with its customers. The Commission noted that TCG’s intention was “to assign the responsibility for loss to the party that has the ability to control or prevent the loss from occurring in the first place.” Further, TCG viewed Ameritech’s proposal as “insulating Ameritech from any harm caused by its actions. Ameritech would have no liability or responsibility to TCG or its customers, even if they are harmed by grossly negligent or deliberate wrongdoing.” TCG believed that “Ameritech’s position would give Ameritech the right to dictate, unilaterally, an important aspect of TCG’s relationship with its customers.” The Commission noted that its staff believed that Ameritech’s proposal was “improper and should not be adopted.” 

The Commission rejected Ameritech’s proposed indemnity provision, disagreeing with Ameritech’s portrayal of its risks. The Commission reasoned that any claim against Ameritech by a TCG customer would have to be founded on contract or tort. The evidence showed that Ameritech did not anticipate having a contractual relationship with TCG’s end users. Thus, the Commission reasoned, a TCG customer could not maintain a successful lawsuit against Ameritech based on a contract claim.

The Commission continued as follows:

“With respect to tort claims against Ameritech, the Illinois Supreme Court has spoken authoritatively on this very point. The Court in In Re Illinois Bell Switching Station Litigation *** reaffirmed the Moorman doctrine. This doctrine stands for the proposition that under the common law purely economic damages are generally not recoverable in tort actions. Three exceptions were articulated (1) where the plaintiff has sustained damage resulting from a sudden or dangerous occurrence (2) where the plaintiff’s damages are the proximate result of a defendant’s intentional, false representation and (3) where the plaintiff’s damages are a proximate result of a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions. The Court held that a tort claim for economic damages incurred from a loss of service arising from a fire at an Illinois Bell switching station was precluded in the absence of any exceptions to the Moorman doctrine.

The Commission believes that the Moorman doctrine provides Ameritech with ample protection in the vast majority of situations it has identified in the record.

In its Brief *** Ameritech maintains that the Proposed Arbitration Decision overlooks the substantial exposure to direct damages in tort left open by the Moorman doctrine. Essentially, Ameritech turns to potential claims for personal injury and property damage to demonstrate its exposure. Providing telecommunications services is not an inherently dangerous activity and it is difficult to imagine many scenarios in which Ameritech’s provision of interconnection services will put third parties at risk. Even if such situations do arise, the public interest does not require that we attempt to insulate either party from the effects of its own improper conduct. 
We believe that it is entirely appropriate that a telecommunications carrier remain responsible for personal injury or property damage which results from its own negligence or willful misconduct. Moreover, as Staff noted there is no general rule or policy which allows the Commission to grant utilities limitations on liability for personal injury and property damage.
 This is particularly true with respect to utilities’ conduct toward individuals who are not customers of the utility under tariff.” (Emphasis added.)

The Commission concluded: “There is potential that [Ameritech’s] proposal would shield Ameritech from responsibility for actions far beyond what is intended by the Commission’s discretionary approval of limitations of liability in Ameritech’s tariffs.”

We agree with the Commission. The Commission stated: (1) it is entirely appropriate that a utility remain responsible for personal injury or property damage that results from its own negligence or willful misconduct, and (2) there is no general rule or policy that allows the Commission to grant utilities limitations on liability for personal injury and property damage. Although the dispute in 
Teleport
 involved Ameritech’s relationship with third parties, 
i.e.
, TCG customers, the Commission’s general statement of the public interest clearly refers also to a utility’s relationship with its own customers. 

These administrative decisions are examples of the Commission’s rejection of the theory of absolute immunity that NI-Gas now proposes. We do likewise.

Additionally, if this tariff provision were a private contract, it would not be interpreted as permitting NI-Gas to absolve itself of any duty to its customers. See 
Reeder v. Western Gas & Power Co.
, 42 Wash. 2d 542, 551, 256 P.2d 825, 830 (1953) (stating that “it would be unreasonable and against public policy to approve such a contractual limitation on the duty to inspect in cases where the facts themselves suggest a duty to inspect”). Although a utility tariff is considered as a statute and not as a contract, we cannot interpret the tariff provision that NI-Gas wrote to completely absolve it of any duty in this regard, when we would not so interpret the same provision in a contract that NI-Gas wrote. See 
Bloom Township High School
, 309 Ill. App. 3d at 175.

Also, this court has held that the Public Utilities Act is in derogation of the common law; accordingly, the Act is to be strictly construed in favor of persons sought to be subjected to its operation. 
Barthel v. Illinois Central Gulf R.R. Co.
, 74 Ill. 2d 213, 220-21 (1978). “Thus, the statute is to be strictly construed in favor of the utility company.” 
Tucker v. Illinois Power Co.
, 232 Ill. App. 3d 15, 29 (1992). However, because the utility company drafts a tariff, it is generally accepted that language in a tariff, especially exculpatory language, is to be strictly construed against the utility company and in favor of the customer. See, 
e.g.
, 
Pink Dot
, 89 Cal. App. 4th at 415, 107 Cal. Rptr. 2d at 397; 
Krasner v. New York State Electric & Gas Corp.
, 90 A.D.2d 921, 921-22, 457 N.Y.S.2d 927, 929 (1982); 
State Farm Fire & Casualty Co. v. Southern Bell Telephone & Telegraph Co.
, 245 Ga. 5, 7, 262 S.E.2d 895, 897 (1980).

Further, a court cannot construe a statute in derogation of the common law beyond what the words of the statute expresses or beyond what is necessarily implied from what is expressed. In construing statutes in derogation of the common law, a court will not presume that an innovation thereon was intended further than the innovation which the statute specifies or clearly implies. 
Russell v. Klein
, 58 Ill. 2d 220, 225 (1974); 
Cedar Park Cemetery Ass’n v. Cooper
, 408 Ill. 79, 82-83 (1951); 
Illinois-American Water Co. v. City of Peoria
, 332 Ill. App. 3d 1098, 1105 (2002) (“Although the [Public Utilities] Act is in derogation of the common law and is to be strictly construed in favor of those sought to be subjected to its operation, the Act will not be extended any further than what the language of the statute absolutely requires by its express terms or by clear implication”). Illinois courts have limited all manner of statutes in derogation of the common law to their express language, in order to effect the least–rather than the most–change in the common law. See, 
e.g.
, 
Bush v. Squellati
, 122 Ill. 2d 153 (1988) (interpreting Ill. Rev. Stat. 1985, ch. 40, par. 607(b)); 
Bagcraft Corp. v. Industrial Comm’n
, 302 Ill. App. 3d 334 (1998) (interpreting 820 ILCS 305/11 (West 1996)).

For example, in 
Barthel
, the plaintiffs brought a statutory cause of action against the defendant railroad seeking damages for personal injuries and wrongful death. Plaintiffs alleged that the railroad violated several regulations pertaining to the safety of railroad crossings. Relying on a strict and literal interpretation of the statutory language, the plaintiffs argued that the statute abrogated the common law defense of contributory negligence. As observed in 
Barthel
:

“They [plaintiffs] argue that the cause of action, being a creature of the statute, bears no relation to the common law concepts of negligence and contributory negligence, and they conclude that since the statute does not provide that contributory negligence shall be a defense, it imposes strict liability on the utility for any violation.” 
Barthel
, 74 Ill. 2d at 220.

The 
Barthel
 court rejected this argument. Noting that the Act is in derogation of the common law, the court reasoned that tort principles would not be deemed abrogated unless it plainly appears that the intent of the statute is to do so. This court held that the statute did not abrogate the common law defense of contributory negligence, and that this common law defense was available to the railroad. 
Barthel
, 74 Ill. 2d at 220-21.

In this case, applying the exact reasoning as applied in 
Barthel
, we must conclude that NI-Gas’ tariff did not abrogate the common law exception to the rule of a gas company’s nonliability. Just as the statute in 
Barthel
 did not abrogate a common law defense, NI-Gas’ tariff does not abrogate the common law exception. This rule of statutory construction cannot be used to provide common law doctrines to assist defendants, but withhold common law doctrines that assist plaintiffs.

Specifically, courts in other jurisdictions have avoided interpretations of utility tariffs that would abrogate the common law. For example, in 
National Food Stores, Inc. v. Union Electric Co.
, 494 S.W.2d 379 (Mo. App. 1973), the Missouri Court of Appeals found that the defendant electric utility owed a common law duty to plaintiff utility customer. 
National Food Stores
, 494 S.W.2d at 381-83. The court then rejected the utility’s contention that its filed tariff immunized it from common law liability for damages. The court strictly construed the tariff, and found that the plaintiff’s allegations fell outside of the tariff’s ambit. Acknowledging the tariff, the court emphasized: “the crucial point is that [the utility] cannot divorce itself from the consequences of its own failure to use ordinary care to avoid harm to its consumers.” 
National Food Stores
, 494 S.W.2d at 384. See also 
Satellite System, Inc. v. Birch Telecom of Oklahoma, Inc.
, 51 P.3d 585, 588 (Okla. 2002) (holding that Oklahoma legislature had not expressed intent that filed-tariff doctrine abolished common law fraud claim against utility); 
State Farm
, 245 Ga. at 6-7, 262 S.E.2d at 896-97 (holding that utility tariff’s limitations period did not abrogate general state law); 
Hall v. Consolidated Edison Corp.
, 104 Misc. 2d 565, 568-70, 428 N.Y.S.2d 837, 840-41 (1980) (holding that tariff did not relieve defendant utility company from its common law tort liability for termination of electrical service); 
Kroger Co. v. Appalachian Power Co.
, 244 Va. 560, 563, 565, 422 S.E.2d 757, 759-60 (1992) (interpreting utility tariff in accord with common law rule, observing that tariff would not shield utility company from “all liability in providing power to a customer beyond the delivery point”).

As we earlier observed, the tariff provision in this case essentially codifies the common law rule that a gas company has no duty with respect to a consumer’s gas pipes and fittings, based on the consumer’s responsibility for his or her equipment, and the company’s lack of knowledge and control. Absent express language that disavows the common law exception based on notice, we cannot say that it was eliminated by the tariff provision. See, 
e.g.
, 
Bush
, 122 Ill. 2d at 161-62 (holding that the statutory provision “cannot, by its silence,” be construed to change the applicable common law); 
Bagcraft Corp.
, 302 Ill. App. 3d at 340 (holding that without “specific language directing application” of a statutory provision to a scenario governed by the common law, “we cannot conclude that the legislature intended to abrogate an entire body of case law”). We note that our appellate court long ago rejected a gas company’s invocation of the Public Utilities Act as a defense to its common law duty. See 
Mrdalj v. Public Service Co. of Northern Illinois
, 308 Ill. App. 424, 430 (1941) (holding where gas company had been notified of odor of gas prior to explosion which killed property owner, gas company could not defend on ground that Public Utilities Act prohibited company from shutting off gas to make inspection, since where gas company has knowledge that gas is escaping in a building occupied by consumer it is gas company’s duty to shut off gas supply until necessary repairs have been made). Based on the above-stated principles of statutory interpretation, this is precisely the situation “for the General Assembly and not this court” to abrogate NI-Gas’ common law duty. See 
Bush
, 122 Ill. 2d at 162.

We hold that NI-Gas’ tariff provision did not absolve the company of its common law duty owed to plaintiff. While a gas company is not an insurer for 
any
 injury sustained as the result of escaping gas, the company is nonetheless liable for its negligence. See 
Pappas
, 350 Ill. App. at 548. 

CONCLUSION

Based on the present record, we have concluded solely that NI-Gas owed a duty to warn in this case. Accordingly, there remains a genuine issue of material fact as to whether NI-Gas breached this duty and, if so, whether this breach proximately caused plaintiff’s injuries. Summary judgment was thus improper. See 
Happel
, 199 Ill. 2d at 198. Therefore, we affirm the judgment of the appellate court, which reversed the circuit court’s grant of summary judgment and remanded the cause for further proceedings.

Affirmed
.

JUSTICE GARMAN, dissenting:

I respectfully dissent. I believe that our analysis should begin and end with the tariff filed by NI-Gas and approved by the Illinois Commerce Commission. As a result, I do not think it necessary to reach the question whether the common law governing the duties of gas companies should be expanded to recognize a duty to warn of the risk that a connector neither owned nor installed by the company may deteriorate from exposure to the odorant that must, by law, be added to the natural gas delivered by NI-Gas to its customers.

The General Assembly enacted the Public Utilities Act (Act) in 1921. An Act concerning public utilities, 1921 Ill. Laws 702, approved June 29, 1921, eff. July 1, 1921. Then, as now, the policy of the state is expressed in the Act:

“It is therefore declared to be the policy of the State that public utilities shall continue to be regulated effectively and comprehensively. It is further declared that the goals and objectives of such regulation shall be to ensure

(a) *** that:

(iv) tariff rates for the sale of various public utility services are authorized such that they accurately reflect the cost of delivering those services and allow the utilities to recover the total costs prudently and reasonably incurred[.]” 220 ILCS 5/1–102(a)(iv) (West 1994).

In return for the protections provided, the Act imposes certain duties upon the utilities it regulates:

“Every public utility shall furnish, provide and maintain such service instrumentalities, equipment and facilities as shall promote the safety, health, comfort and convenience of its patrons, employees and public and as shall be in all respects adequate, efficient, just and reasonable.

All rules and regulations made by a public utility affecting or pertaining to its charges or service to the public shall be just and reasonable.

Every public utility shall, upon reasonable notice, furnish to all persons who may apply therefor and be reasonably entitled thereto, suitable facilities and service, without discrimination and without delay.” 220 ILCS 5/8–101 (West 1994).

In addition, regarding the duties of public utilities to providing services and facilities, the Act requires that:

“Every public utility subject to this Act shall provide service and facilities which are in all respects adequate, efficient, reliable and environmentally safe and which, consistent with these obligations, constitute the least-cost means of meeting the utility’s service obligations.” 220 ILCS 5/8–401 (West 1994).

This court has long acknowledged that the “policy established by legislation for the regulation of public utilities is to provide the public with efficient service at a reasonable rate by compelling an established public utility occupying a given field to provide adequate service and at the same time to protect it from ruinous competition.” 
Illinois Power & Light Corp. v. Commerce Comm’n
, 320 Ill. 427, 429-30 (1926). More recently, this court reiterated: “The Public Utilities Act [citation], under which the Commerce Commission regulates all public utilities, was enacted to assure the provision of efficient and adequate utility service to the public at a reasonable cost.” 
Local 777 v. Illinois Commerce Comm’n
, 45 Ill. 2d 527, 535 (1970). See also 
Bloom Township High School v. Illinois Commerce Comm’n
, 309 Ill. App. 3d 163, 175 (1999).

The Act requires the utility to file a tariff with the Illinois Commerce Commission. 220 ILCS 5/9–102 (West 1994). The tariff “plays an integral role” in allowing the utility to meet the expectations of the General Assembly. 
In re Illinois Bell Switching Station Litigation
, 161 Ill. 2d 233, 244 (1994). The liability limitations contained in an approved tariff serve the public policies of establishing uniform affordable rates and providing universal service by limiting the utility’s exposure to liability. Thus, although the tariff may be seen as stating the terms of the contract between the utility and its customers, it is more than a mere contract between buyer and seller. There is a third party to the transaction–the state, which as a matter of public policy has chosen to limit the liability of utilities in return for regulation of their rates. As this court has noted:

“ ‘ “The theory underlying [decisions upholding the right of regulated utilities to limit their liabilities] is that a public utility, being strictly regulated in all operations with considerable curtailment of its rights and privileges, shall likewise be regulated and limited as to its liabilities. In consideration of its being peculiarly the subject of state control, ‘its liability is and should be defined and limited. [Citation.] There is nothing harsh or inequitable in upholding such a limitation of liability when it is thus considered that the rates as fixed by the commission are established with the rule of limitation in mind. Reasonable rates are in part dependent upon such a rule.” ’ ” 
Illinois Bell Switching Station
, 161 Ill. 2d at 245-46, quoting 
Waters v. Pacific Telephone Co.
, 12 Cal. 3d 1, 7, 523 P.2d 1161, 1164, 114 Cal. Rptr. 753, 756 (1974), quoting 
Cole v. Pacific Telephone & Telegraph Co.
, 112 Cal. App. 2d 416, 419, 246 P.2d 686, 688 (1952).

The tariff limits liability by narrowly defining the duties undertaken by the utility and disclaiming any additional duties. The majority acknowledges our prior case law, which requires that any duty other than those specifically imposed upon the utility by the Act itself must be found in the tariff:

“Illinois courts have long held that a tariff provision such as the one at issue in this case provides the source for, and determines the nature and extent of, a public utility’s service obligations to its customers.” Slip op. at 20, citing 
J. Meyer & Co. v. Illinois Bell Telephone Co.
, 88 Ill. App. 3d 53, 55 (1980), and 
Sarelas v. Illinois Bell Telephone Co.
, 42 Ill. App. 2d 372, 374-75 (1963).

See also 
Illinois Bell Switching Station
, 161 Ill. 2d at 248 (Miller, J., specially concurring).

As the majority also acknowledges, Illinois law on the subject of tariffs has its roots in federal law, specifically, the federal “filed-rate doctrine.” Slip op. at 18. Although this doctrine is no longer in effect in the federal courts (see 
Tempel Steel Corp. v. Landstar Inway Inc.
, 211 F.3d 1029, 1030 (7th Cir. 2000) (noting that the ICC Termination Act, 109 Stat. 803 (1995), abolished the tariff filing requirement and the filed-rate doctrine)), it is still a useful starting point for any analysis of the legal effect of a utility tariff filed and approved pursuant to state law.

In 
Western Union Telegraph Co. v. Esteve Brothers & Co.
, 256 U.S. 566, 65 L. Ed. 1094, 41 S. Ct. 584 (1921) (cited in slip op. at 18), the issue was whether the plaintiff/customer was “without assent in fact, bound as matter of law by the provision limiting liability, because it is a part of the lawfully established rate.” 
Esteve Brothers
, 256 U.S. at 570, 65 L. Ed. at 1097, 41 S. Ct. at 586. The Court held that “limitation of liability was an inherent part of the rate. The company could no more depart from it than it could depart from the amount charged for the service rendered.” 
Esteve Brothers
, 256 U.S. at 571, 65 L. Ed. at 1097, 41 S. Ct. at 586. As the majority notes, the federal act at issue in 
Esteve Brothers
:

“introduced a new principle into the legal relations of the telegraph companies with their patrons which dominated and modified the principles previously governing them. Before the act the companies had a common law liability from which they might or might not extricate themselves according to views of policy prevailing in the several states. *** Uniformity demanded that the rate represent the whole duty and the whole liability of the company. It could not be varied by agreement; still less could it be varied by lack of agreement. The rate became, not as before a matter of contract by which a legal liability could be modified, but a matter of law by which a uniform liability was imposed.” 
Esteve Brothers
, 256 U.S. at 571-72, 65 L. Ed. at 1097-98, 41 S. Ct. at 586.

Later, in 
Western Union Telegraph Co. v. Priester
, 276 U.S. 252, 72 L. Ed. 555, 48 S. Ct. 234 (1928), the Court stated that once the Interstate Commerce Commission approved a tariff, the “established rates *** became the lawful rates and the attendant limitation of liability became the lawful condition upon which messages might be sent.” 
Priester
, 276 U.S. at 259, 72 L. Ed. at 565, 48 S. Ct. at 235. “What had previously been a matter of common law liability, with such contractual restrictions as the states might permit, then became the subject of federal legislation to secure reasonable and just rates for all without undue preference or advantage to any. Since that end is attainable only by adherence to the approved rate *** that rate ‘represents the whole duty and the whole liability of the company.’ ” 
Priester
, 276 U.S. at 259, 72 L. Ed. at 565, 48 S. Ct. at 235, quoting 
Esteve Brothers
, 256 U.S. at 572, 65 L. Ed. at 1097, 41 S. Ct. at 586. In response to plaintiff’s argument that the company’s tariff could not limit its liability for “gross negligence,” the Court concluded: “We may not disregard a lawful exercise of the regulatory power which has made no distinction between degrees of negligence, nor may we, upon any theory of public policy, annex to the rate as made conditions affecting its uniformity and equality.” 
Priester
, 276 U.S. at 260, 72 L. Ed. at 565, 48 S. Ct. at 236.

More recently, the Court stated that the “ ‘rights as defined by the tariff cannot be varied or enlarged by 
either contract or tort 
of the carrier.’ ” (Emphasis added.) 
American Telephone & Telegraph Co. v. Central Office Telephone, Inc.
, 524 U.S. 214, 227, 141 L. Ed. 2d 222, 236, 118 S. Ct. 1956, 1965 (1998), quoting 
Keogh v. Chicago & Northwestern Ry. Co.
, 260 U.S. 156, 163, 67 L. Ed. 183, 187, 43 S. Ct. 47, 49 (1922). The majority quotes this language, but overlooks the significance of the mention of torts as well as contracts. Slip op. at 17.

The General Assembly, by enacting the Public Utilities Act and creating the Illinois Commerce Commission with the power to approve tariffs filed by public utilities, has made clear the public policy of the State, which is to hold public utilities to those duties expressly set out in the Act and the approved tariffs, and to preclude the judicial recognition of additional duties on the basis of common law reasoning. Thus, the majority is correct that whether the tariff bars plaintiff’s cause of action “depends on the nature of plaintiff’s lawsuit and the meaning of the tariff’s language.” Slip op. at 22.

Nature of the Lawsuit

The majority correctly states that “ ‘all state law causes of action are not necessarily precluded’ ” by the existence of a filed and approved tariff. Slip op. at 19, quoting 
Pink Dot, Inc. v. Teleport Communications Group
, 89 Cal. App. 4th 407, 416, 107 Cal. Rptr. 2d 392, 398 (2001). The nature of a lawsuit may place it outside the scope of the tariff’s limitation of liability provisions.

Thus, although Pink Dot acknowledged that Teleport’s liability for gross negligence was limited by the applicable tariff, Pink Dot argued that its claims against Teleport for breach of contract, fraud, willful misconduct, intentional interference with economic relations, and unfair competition were not barred. 
Pink Dot
, 89 Cal. App. 4th at 412, 107 Cal. Rptr. 2d at 395. This argument was supported by a state statute providing that “ ‘All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of the law, whether willful or negligent, are against the public policy of the law.’ ” 
Pink Dot
, 89 Cal. App. 4th at 413-14, 107 Cal. Rptr. 2d at 396, quoting Cal. Civ. Code §1668 (1994). Further, the Teleport’s tariff was “silent as to the required liability for any willful misconduct, fraud, or violations of law,” although it did contain “clauses intended to limit [its] liability to its customers for damages caused by its conduct.” 
Pink Dot
, 89 Cal. App. 4th at 414, 107 Cal. Rptr. 2d at 396-97. In the end, 
Pink Dot 
stands for the unremarkable proposition that when a state statute expressly precludes such a limit, a tariff’s $10,000 limit on liability cannot “eliminate [the utility’s] liability for willful misconduct, fraud or violations of law by merely omitting the acknowledgment of such liability from its tariff.” 
Pink Dot
, 89 Cal. App. 4th at 414, 107 Cal. Rptr. 2d at 397.

In 
Adamson v. Worldcom Communications, Inc.
, 190 Or. App. 215, 78 P.3d 577 (2003) (quoted in slip op. at 19), plaintiff’s claim for unfair trade practices was not barred where the tariff limited the defendant’s liability “ ‘unless such damages are a result of Company’s willful misconduct.’ ” 
Adamson
, 190 Or. App. at 222, 78 P.3d at 582.

The tariff at issue in the present case expressly states that NI-Gas “assumes no responsibility in connection with the installation, maintenance or operation” of the customer’s equipment. Plaintiff has not cited either a state statute (as in 
Pink Dot
) or language of the tariff (as in 
Adamson
) that precludes the limitation of liability claimed by NI-Gas. Nor has she brought a claim for fraud, negligent driving of a vehicle owned by the utility, or other tortious conduct of the sort that would place it outside the scope of the limitation of liability clause of the tariff. Thus, the duty claimed by plaintiff must be found to exist on the basis of the language of the tariff, or not at all.

Construction of the Tariff

The Act is in derogation of the common law. 
Illinois Bell Switching Station
, 161 Ill. 2d at 240. The majority acknowledges that, as a result, the Act it is to be strictly construed in favor of persons sought to be subjected to its operation, that is, in favor of the utility. Slip op. at 28. As the majority also notes, once the tariff is approved by the Commission, it has the force of law. Slip op. at 17 (citing 
Illinois Bell Switching Station
, 161 Ill. 2d at 244, and
 Illinois Central Gulf R.R. Co. v. Sankey Brothers, Inc.
, 67 Ill. App. 3d 435, 439 (1978) (stating that “[a] tariff is a law, not a contract, and has the force and effect of a statute”), 
affirmed
, 78 Ill. 2d 56 (1979)). Further, the majority states that interpretation of the tariff is governed by the rules of statutory construction. Slip op. at 24.

Nevertheless, the majority, citing cases from California, New York, and Georgia, states that the language of the tariff, especially any exculpatory language, should be strictly construed against the utility, based on the canon of construction of 
contracts
 that 
contract terms 
should be construed against the drafter. Slip op. at 28. Although it may be “generally accepted” (slip op. at 28) in some jurisdictions that a tariff should be construed as a mere contract, there is also contrary authority. The courts of Washington and Oregon, for example, apply the standard principles of statutory construction to the interpretation of a tariff, including applying the rule of construction that the court is to ascertain the drafters’ intent when they promulgated the language. See, 
e.g.
, 
National Union Insurance Co. v. Puget Sound Power & Light
, 94 Wash. App. 163, 171, 972 P.2d 481, 484 (1999); 
U.S. West Communications, Inc. v. City of Longmont
, 924 P.2d 1071, 1079 (Colo. App. 1995).

Even in a jurisdiction in which the “construe against the drafter” canon is applied to public utility tariffs, it has been said that “a strict construction against a tariff’s author is not justified where the construction would ignore a permissible and reasonable construction which conforms to the intentions of the framers of the tariff.” 
Info Tel Communications, LLC v. US West Communications, Inc.
, 592 N.W.2d 880, 884 (Minn. App. 1999).

This court has never held that a public utility tariff should be construed against the utility that drafted the language. There are valid arguments to be made on both sides because the tariff has characteristics of both contract and statute. This court may in some future case be called upon to decide whether ambiguous language in a tariff should be construed in favor of or against the drafting utility. This is not such a case. The language at issue is unambiguous. NI-Gas “assumes no responsibility in connection with the installation, maintenance or operation” of the customer’s equipment. Our duty is to apply the plain meaning of these words, in light of the underlying purpose of the Act, which is to provide citizens of Illinois with utility service at reasonable rates and, as a necessary part of that scheme, to limit the liability of utility companies.

The majority also suggests that the tariff provision should not be given effect because, if it “were a private contract, it would not be interpreted as permitting NI-Gas to absolve itself of any duty to its customers.” Slip op. at 27. This statement misses the point in several respects. First, it defies logic to say that a tariff should be enforced under the same rules as a private contract. The entire concept of a tariff is that it supercedes any contract between the utility and the individual customer. Indeed, the utility is forbidden from privately contracting around the terms of the tariff. Second, the Act and the tariff do not permit the utility to absolve itself of “any duty.” They permit, indeed they require, that the utility undertake precisely defined duties to its customers. Finally, unlike a private company, a public utility cannot adjust its prices to compensate for increased exposure to liability when the courts recognize a new common law duty.

For example, in 
Sarelas
 the plaintiff claimed that Illinois Bell Telephone owed him a duty of continuing service, which it violated by interrupting his service for 2½ hours as the result of a clerical error. The appellate court noted that “in the case of an ordinary corporation this would be nothing of which to complain, for in general a corporation is entitled to refrain from doing business with its customers unless it is otherwise bound by contract; but a utility is different. It has a duty to its subscribers that goes beyond that of an ordinary corporation. However, 
this duty has but one source
, the tariff, which in this instance is on file with the Illinois Commerce Commission.” (Emphasis added.) 
Sarelas
, 42 Ill. App. 2d at 374. Thus, the court observed, “the extent to which defendants owed plaintiff ‘a legal duty’ is determined by the particular provisions of the tariff on file with the commission; there is no contract *** on which plaintiff can rely, nor are his allegations of a breach of duty sufficient to constitute a claim in tort.” 
Sarelas
, 42 Ill. App. 2d at 375. In the end, a breach of duty by the utility “arises either from the tariff or not at all.” 
Sarelas
, 42 Ill. App. 2d at 375.

Following the mandate to construe the Act strictly in favor of the regulated utility, the appellate court in 
Barthel v. Illinois Central Gulf R.R. Co.
, 74 Ill. 2d 213 (1978), held that section 73 of the Act, which allows the utility to be held liable for certain acts and omissions, did not abrogate the common law defense of contributory negligence because it did not plainly appear that the intent of the statute was to impose strict liability. 
Barthel
, 74 Ill. 2d at 221. See also
 Tucker v. Illinois Power Co.
, 232 Ill. App. 3d 15, 29 (1992) (construing Act as not authorizing award of punitive damages in action for negligent termination of gas service in below freezing weather when plaintiff would not have been entitled to punitive damages under common law theory of liability).

The majority purports to apply the “exact reasoning” of 
Barthel
 (slip op. at 29), when it concludes that just as the statute in 
Barthel
 did not abrogate a pre-existing common law defense, the tariff at issue here “does not abrogate the common law exception.” Slip op. at 29. Plaintiff, however, does not seek to hold NI-Gas liable under an 
existing
 exception to the common law rule that gas companies have no duty with regard to the fixtures and equipment of their customers. She seeks to expand the existing exception to recognize an 
entirely new duty
 to warn.

The majority observes that NI-Gas has had opportunities in the past to assert that the tariff precludes imposition of a duty, yet has not done so. Slip op. at 20. This observation is not persuasive for two reasons. First, simple logic dictates that a party’s decision to raise a particular issue or assert a particular defense in one litigation has no preclusive effect in later litigation with an entirely different party. Second, the cases cited by the majority are inapposite. In
 Pioneer Hi-Bred Corn Co. of Illinois v. Northern Illinois Gas Co.
, 61 Ill. 2d 6 (1975), the plaintiff’s theory of liability was that NI-Gas negligently performed an inspection. There was no leak or defect in the plaintiff’s equipment. Rather, NI-Gas employees purportedly inspected plaintiff’s equipment for the specific purpose of determining the proper pressure for the delivery of gas to the plaintiff’s premises. 
Pioneer Hi-Bred
, 61 Ill. 2d at 9. Previously, in
 Clare
, this court had noted that a gas company has no duty to inspect the pipes or fixtures belonging to a customer in the absence of notice of a defect. 
Clare
, 356 Ill. at 244. Indeed, the gas company has no right to “go upon the premises of one of its customers for the purpose of inspecting his pipes or other fixtures except upon the invitation, license or permission of the owner.” 
Clare
, 356 Ill. at 244. In 
Pioneer Hi-Bred
, as in 
Clare
, a gas company employee was invited to enter the plaintiff’s premises for the purpose of making an inspection. The inspections served different purposes: in 
Clare
, to determine the source of an offensive odor; in 
Pioneer Hi-Bred
, to calculate the proper pressure for the delivery of gas. In 
Clare
, the gas company was not liable for the eventual damages and injuries because the evidence showed that the inspection, which was not “negligently or unskillfully made,” did not reveal the source of the leak. 
Clare
, 356 Ill. at 245. In 
Pioneer Hi-Bred
, the gas company might have been held liable for negligently conducting an inspection had the plaintiff proven that an inspection actually took place. 
Pioneer Hi-Bred
, 61 Ill. 2d at 13-14. This court agreed with NI-Gas that the trial court properly refused to give the requested instruction on negligent inspection to the jury, because the tendered instruction assumed a fact in dispute–that there had actually been an inspection. 
Pioneer Hi-Bred
, 61 Ill. 2d at 13-14. The majority’s statement that “[n]either this court nor NI-Gas believed that this tariff precluded a common law analysis in a negligence action for personal injury” in 
Pioneer Hi-Bred
 (slip op. at 21), although true, is irrelevant. The common law duty asserted in 
Pioneer Hi-Bred
 had already been recognized in 
Clare
.

The majority also points to this court’s decision in
 Metz v. Central Illinois Electric & Gas Co.
, 32 Ill. 2d 446 (1965), as further support for its statement that “where a utility tariff speaks to a specific duty, the tariff 
may be controlling
; however, where the tariff does not address a particular situation, the common law applies and a common law duty analysis must be applied.” (Emphasis added.) Slip op. at 21. When a tariff speaks to a specific duty, as in this case, it 
is
 controlling. The majority asks why the appellate court failed to mention the tariff in this case. Slip op. at 21. 
Metz
 involved an explosion that occurred as a result of a defect 
in the gas main
, which is the responsibility of the gas company both under the tariff and at common law. Thus, the answer to the majority’s question is obvious–the tariff was irrelevant to the gas company’s alleged negligence to properly maintain 
its own equipment
.

The majority is determined to ignore our obligation to determine whether NI-Gas has a duty to warn by looking at the plain language of the tariff, even if that plain meaning departs from the manner in which the common law may have developed in the decades since the Act was adopted and the tariff was approved, or the way in which we would decide the question today. I accept, 
arguendo
, the majority’s statement that “it is evident that the tariff essentially codifies the common law rule that a gas company has no duty with respect to a consumer’s gas pipes and fittings.” Slip op. at 23. Thus, I do not dispute the majority’s conclusion that the tariff “did not abrogate the common law exception to the rule of a gas company’s nonliability.” Slip op. at 29. That exception, however, applies only when the gas company has actual or constructive knowledge of a gas leak or a defect on the premises of the individual customer.

NI-Gas had neither actual nor constructive notice of a gas leak in the Adams’ home. At most, NI-Gas was aware that some Cobra connectors might still be in use in its service area, and that these connectors could fail after prolonged exposure to the odorant that NI-Gas is required, by law, to add to natural gas. This does not constitute a “a gas leak of which it has notice.” Slip. op at 24.

The majority even admits that recognizing a duty to warn on the facts of this case would not be based on the common law as it existed at the time the tariff was filed and approved some fifty years ago. It would, instead, be a “reasoned adaptation” of the preexisting common law. Slip op. at 15. Our prior case law does not permit such “reasoned adaptation” of the common law when it would alter the terms of the applicable tariff.

The majority’s conclusion that “allowing this cause of action to proceed would not contravene” the public policy of this state regarding liability limitations contained in public utility tariffs (slip op. at 23) is similarly flawed. Although plaintiff does not seek a rate preference or enforcement of a “side agreement,” she is seeking to impose liability in tort in excess of that permitted by the tariff. Exposure to liability in tort bears a direct relationship to rate setting. See 
Illinois Bell Switching Station
, 161 Ill. 2d at 245.

Meyer
 is cited by majority (slip op. at 18) for proposition that the tariff “provides the source for, and determines the nature and extent of, a public utility’s service obligations to its customers.” The 
Meyer
 plaintiffs installed an alarm system on their premises and connected it to the defendant’s equipment at a junction box located on a telephone pole. Burglars disconnected the alarm at the junction box and made off with hundreds of thousands of dollars worth of property from the plaintiffs’ warehouse. The issue on appeal was whether the defendant utility owed a duty to the plaintiffs “under the circumstances as alleged.” As in the present case, the circumstances in 
Meyer
 included a connection between the customer’s equipment and the utility’s equipment. That connection failed and plaintiffs suffered damages as a result. Citing 
Sarelas
, the appellate court stated, “It has been established that the source of any duty of Illinois Bell, as a public utility, to its subscribers is only in the tariff as filed.” 
Meyer
, 88 Ill. App. 3d at 55. The portions of the tariff dealing with customer-provided equipment and systems plainly stated that:

“ ‘[W]here such equipment or system is connected to Company facilities the responsibility of the Company shall be limited to the furnishing of facilities suitable for exchange telecommunications service or *** the Company shall not be responsible for (1) the through transmission of signals generated by the customer-provided equipment or system, or for the quality of, or defects in, such transmission ***.’ ” 
Meyer
, 88 Ill. App. 3d at 55.

Thus, the appellate court found that the “plain language of this provision exculpates [the telephone company] from liability.” 
Meyer
, 88 Ill. App. 3d at 55. The court affirmed the trial court’s dismissal of the complaint because “the tariff is the sole source of any duty owed by defendant to plaintiffs” and the plaintiffs had failed to establish a duty thereunder. 
Meyer
, 88 Ill. App. 3d at 56.

Further, the 
Meyer
 court found “a reasonable basis for treating this public utility differently from private corporations and for limiting its liability to subscribers in the rendering of its service.” 
Meyer
, 88 Ill. App. 3d at 57. The Act requires that all rates and charges imposed by a public utility be just and reasonable and, to achieve this end, such rates and charges are fixed by a state agency. “Without the limitations on liability set forth by the tariff, defendant would be uniquely vulnerable to claims based on signal transmission defects which may result from a variety of causes, adversely affecting its ability to fulfill the public need for reasonable telephone service charges. This would be particularly true of 
defects 
in the transmission of signals 
originating from customer-provided equipment over which the company could have little control
.” (Emphases added.) 
Meyer
, 88 Ill. App. 3d at 57.

In addition to 
Sarelas
 and 
Meyer
, the majority also cites 
North River Insurance Co. v. Jones
, 275 Ill. App. 3d 175 (1995) (slip op. at 16), as a source for the definition of a tariff: “A tariff is a public document setting forth services being offered, rates and charges with respect to services and governing rules, regulations and practices relating to those services.” 
North River
, 275 Ill. App. 3d at 185, citing Black’s Law Dictionary 1306 (5th ed. 1979). However, the majority fails to note the holding of 
North River
. The tariff filed by the defendant utility, Illinois Bell Telephone, described the terms and conditions under which it would provide service, including the limitation of liability provision, which had been in effect for “the past 50 years.” 
North River
, 275 Ill. App. 3d at 185. Once such a tariff is implemented, the court held, the utility is “forbidden from deviating from its terms. It is the filed tariff that defines the scope of duty owed by [the utility]. The source of any duty of [the utility], as a public utility to its subscribers, is only in the tariff as filed.” 
North River
, 275 Ill. App. 3d at 185 (citing 
Meyer
, 88 Ill. App. 3d at 55, and 
Sarelas
, 42 Ill. App. 2d at 375).

Thus, I conclude that the appellate court in the present case originally reached the correct result when it concluded that 
Illinois Bell Switching
 was dispositive and held that NI-Gas owed no duty to plaintiff’s decedent. The overwhelming weight of authority from both this court and our appellate court supports this result. Plaintiff has identified no language in the tariff or in the Act from which the duty she claims can be said to arise. Indeed, the plain language of the tariff expressly disclaims any such duty.

Even if the common law exception imposing a duty based on actual or constructive knowledge of a leak or defect in the customer’s equipment is deemed to be incorporated into the tariff, it cannot reasonably be said that the tariff also incorporates any change in the common law of duty that the courts of this state subsequently make. To do so would be to engage in bootstrapping of the most egregious kind. In effect, tariffs would not have the effect of statutes. Rather, they would become mere restatements of the common law, subject to change over time as the common law of negligence evolves. This is precisely the situation that the legislature sought to avoid.

The majority responds to this statement by citing 
Bush v. Squellati
, 122 Ill. 2d 153 (1988), for the proposition that it is for the General Assembly, not this court, to abrogate NI-Gas’ common law duty. Slip op. at 31. 
Bush
 is inapposite. The issue was whether the maternal grandparents of a child who was adopted by other relatives on the maternal side of the child’s birth family had standing to seek court-ordered visitation. This court found no statutory basis for standing and noted that it was for the legislature to “expand grandparental visitation rights.” Subsequent legislative efforts to do so have met with constitutional barriers. See 
Wickham v. Byrne
, 199 Ill. 2d 309 (2002). 
Bush
 hardly offers support for the majority’s conclusion that the tariff does not 
already
 shield NI-Gas from liability under these facts.

Conclusion

The death of Janice Adams was tragic. It is a further tragedy that the entity likely to blame for the defect that caused her death is no longer in business. That unfortunate fact, however, is not a sufficient basis for this court to ignore the public policy of this state as expressed in the Act and the plain language of the tariff with regard to limits of liability.

In sum, this court should be guided by our holding in 
Illinois Bell Switching Station
, 161 Ill. 2d at 244, that the exculpatory language in the tariff, which has been “accepted for decades by the General Assembly, is neither in contravention of the Act passed by that same body, the rules passed by the Commission (an agency of that body), nor against public policy.” The plain language of the tariff, which not only does not impose a duty to warn of hazards associated with pipes and fixtures installed and owned by the customer, but also expressly disclaims any such liability, should be given effect by this court. I would affirm the judgment of the circuit court, granting summary judgment in favor of the defendant, NI-Gas.

JUSTICES FITZGERALD and THOMAS join in this dissent.

FOOTNOTES
1:     
1
Count I named Georgevich as a defendant. Plaintiff alleged that Georgevich owed decedent “a duty of ordinary care to insure the aforesaid premises was reasonably safe for occupancy;” and that Georgevich breached this alleged duty by (a) failing “to inspect and/or cause the inspection of the aforesaid premises for fire safety and prevention;” and (b) permitting the occupancy of the house “when not reasonably safe to do so.” Georgevich filed an unopposed motion for summary judgment against plaintiff. Georgevich contended that she had no duty of care with respect to decedent’s house. She argued that although she owned decedent’s house, it was in decedent’s exclusive possession and control. The circuit court granted the motion. 

2:     
2
The American National Standards Institute (ANSI) “is a voluntary membership organization that develops consensus standards nationally for a wide variety of devices and procedures.” 
Thatcher v. TWA
, 69 S.W.3d 533, 536 (Mo. App. 2002); accord 
Schultz v. Northeast Illinois Regional Commuter R.R. Corp.
, 201 Ill. 2d 260, 269 (2002).

3:     
3
NI-Gas also brought a contribution claim against Georgevich. If found liable to plaintiff, NI-Gas sought contribution from Georgevich in such amount that was attributable to Georgevich’s relative fault. Georgevich subsequently moved for summary judgment on NI-Gas’ contribution claim against her. After granting NI-Gas’ motion for summary judgment against plaintiff, the circuit court ruled that Georgevich’s motion for summary judgment on NI-Gas’ contribution claim was moot.