SIXTH DIVISION
February 4, 2011

No. 1-09-3126

| | |
|---|---|
| DARRYL L. BELTON, | ) Appeal from |
| | ) the Circuit Court |
| Plaintiff-Appellant, | ) of Cook County |
| | ) |
| v. | ) 06 L 11107 |
| | ) |
| FOREST PRESERVE DISTRICT OF COOK COUNTY, | ) Honorable |
| | ) Jennifer Duncan-Brice, |
| Defendant-Appellee. | ) Judge Presiding |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justices Cahill and R. E. Gordon concurred in the judgment and opinion.

O P I N I O N

A dead tree limb fell from a public forest preserve onto a car traveling on an adjacent road. The motorist filed a negligence action, but the trial court entered summary judgment for the forest preserve (735 ILCS 5/2-1005 (West 2004)), on grounds that it did not owe the motorist a duty of care to maintain its property. The motorist appeals.

Plaintiff Darryl L. Belton,[1] of Hammond, Indiana, was injured on December 30, 2005, at about 8:30 p.m. while driving his 2005 Pontiac G6 sedan westbound through Calumet City, Illinois, on 159th Street, which was also known as River Oaks Drive due to its proximity to River Oaks shopping center. The road was controlled by the Illinois Department of Transportation (hereinafter Department of Transportation) or Calumet City. Directly north of the road was land that was mostly undeveloped and maintained as the Green Lake forest preserve by defendant

---

[1] The appellant's opening and reply briefs refer to the appellant as "Daryl"; however we use the spelling that appears consistently in the record on appeal.

Forest Preserve District of Cook County (hereinafter District). Belton was driving past the public recreational area toward Torrance Avenue when a large, dead limb fell from a cottonwood tree onto his vehicle. He was transported from the scene to the hospital with injuries including a fractured vertebra and his car was towed away. The driver of the vehicle immediately following Belton's Pontiac saw what occurred.

Belton sued the District, but not Calumet City or the Department of Transportation, in the circuit court of Cook County. In count I of his second amended complaint, Belton sought compensation for personal injuries and property damage caused by the District's negligence, based on allegations that he was on "a public thoroughfare," it is "common knowledge *** that dead trees and associated limbs are structurally unsound and at an extreme risk for collapse or fall" and it is "routine for property owners containing trees which adjoin or are near to public roadways to inspect trees and create 'safe zones' to ensure trees and limbs do not fall onto public roadways." He alleged the District "had a duty under [*sic*] to exercise ordinary care to maintain its property and prevent dead tree limbs or dead trees from falling onto adjoining roadways." He further alleged, "The cost of a visual inspection of trees adjoining roadways would have been minimal, and should have been employed at the Green Lake Woods area." Also, the tree and specific limb which fell onto his vehicle were so rotten or decayed for a "substantial period" that it would have been obvious from a "drive-by visual inspection" that they "posed immediate threats to the public," and because of the limb's "open and obvious position adjoining River Oaks Drive," the District "should have known of [its defective] condition." Finally, "The catastrophic consequences of the [District's] failure to inspect its trees were foreseeable, known, and greatly

2

outweighed the practicability and cost of inspection." In count II of the second amended complaint, Belton alleged a statutory violation, but he withdrew this claim, and in prior complaints he had alleged willful and wanton conduct, but he did not allege this theory in the pleading at issue on appeal.

The parties' discovery included deposing John Raudenbush, a 27-year employee of the District, and his supervisor, Richard D. Newhard, who had been with the District for 36 years. Both men had degrees in natural resources management and were recognized by the International Society of Arborists as certified arborists. Their testimony established that District employees pruned and removed vegetation if it would impede mowing operations or was in recreational areas such as picnic grounds and could pose a hazard to users of the preserve. Most of the resource management employees working in the Green Lake area in 2005 had gone through the time-consuming process of becoming certified arborists and were formally trained to determine whether trees were potentially hazardous. Indications of a potential hazard would include dead wood or branches, a lack of any bark, fungus growth, a compromised root system, erosion, and whether the tree would cause damage to individuals or personal property if it failed. Only about 10% of the District's property holdings were for recreational use, such as picnicing, and in the other areas the District normally adhered to its statutory mission to preserve, protect, and restore natural areas by allowing vegetation to remain undisturbed as a habitat for fungi, birds, and insects. The District relied on its employees, staff, and the public to identify trees needing pruning or removal, instead of devoting employees exclusively to the task of inspecting vegetation. The District followed up on every report of a potential hazard and heightened its own scrutiny after

storms. This had been its practice throughout Newhard's 36 years with the District, other than an inspection initiative made in the early 1970's to locate and eradicate diseased Dutch elm trees. Raudenbush was not aware of any motorist being struck by a falling tree other than Belton. Newhard had not seen the tree at issue, but had been informed by the District's real estate licensing engineer that the cottonwood was in the right-of-way granted to the Department of Transportation. As a general rule, the District limited its maintenance to its property, and in instances where a right-of-way had been granted, the grantee took responsibility. There would be liability issues if the District personnel worked on other property. If it appeared that maintenance was needed on an adjacent right-of-way or private land, the District would try to contact the party responsible. The District routinely used Sidwell Maps, which showed all the roads within the county, whether there was a right-of-way, and who was responsible for maintenance.

Belton's tree expert Jeffrey Ling was also deposed. Ling had approximately 25 years' experience, was a registered consulting arborist, owned and operated a commercial tree care company in Fort Wayne, Indiana, and worked as a consultant for attorneys, golf courses, municipalities, developers, architects, homeowners, and corporate facility managers. Ling also had or was (1) teaching landscape management and urban forestry at Indiana Vocational Technical College, (2) leading professional seminars, and (3) conducting training for the Indiana Urban Forestry Council's Tree Tenders program, which is a volunteer association of private citizens who are trained to recognize and report hazardous trees to their local parks department or municipality. Ling indicated the tree was visibly infected with Ganoderma fungus for five or six years before Belton's accident, there were no leaves on the upper half of its crown, and these

4

were problems that could have been seen from a vehicle moving at "a very high rate of speed" on 159th Street and would have warranted further inspection. In Ling's opinion: (1) given the condition of the tree, whoever was responsible for maintaining it should have done more prior to Belton's injury, and (2) the District fell below the standard of urban forestry and arboriculture as Ling understood it by not having a systematic inspection system to identify diseased trees that "had targets," meaning that if all or part of the tree failed, a person could be injured. In Fort Wayne, they inventoried the public trees with the help of computer software that allowed them to assign a unique address to each one, using GPS, GIS, a street address, or the relation to the nearest crossroads. Ling agreed that cataloging trees in a park would be a lot more work than cataloging trees along a public street that were spaced at regular intervals and could be identified by their street address. Park trees would need to measured by hand, identified by species, and associated with a specific location. Ling based his criticism of the District on what Belton's attorney told him about the District's practices, two paragraphs that were read to him from the transcript of a District employee's deposition, and a site visit. Ling, however, visited only the specific area, had never consulted for the District, and did not know the extent of its property holdings, what types of facilities it maintained, how many acres it maintained, how many trees were on its property, how many public roadway miles bordered its property, how many people it employed, its statutory mission, or that it was a municipal corporation.

The District's expert Mark Duntemann was the owner and sole employee of an urban forest consulting company and his primary business was inventorying trees for municipalities and developing forestry management policies for government agencies. Based on a survey taken of

5

the area, a site visit, certain photographs, and deposition transcripts, it was his opinion that the District was not responsible for the 70-foot tree that failed; because it was approximately 30 inches in diameter, and all but 4 inches of the trunk was within the 50-foot right-of-way from the centerline of 159th Street, meaning that either the Department of Transportation or Calumet City was responsible for maintaining it. The District had approximately 37,000 wooded acres, and based on Duntemann's inventory experience, he estimated the District's holdings encompassed 500,000 or more trees. In his opinion, a "windshield survey" from a moving vehicle to look for hazardous trees would have been inadequate, and the appropriate method would be to circumvent the tree, visually inspecting it and "sounding" it with a mallet to detect decay. In his opinion, the District relied on "a highly trained professional staff to *** look at trees and make a determination of risks associated with the trees," this "system works well for them," and it was his recommendation that they continue to follow it. The District should not have done anything differently to prevent the tree from falling on Belton's vehicle. He did not know whether a "windshield inspection" from 159th Street in the two years prior to Belton's injury would have identified the tree as one with potential structural defects. Because he did not know how many miles of roads bordered the District's property, Duntemann could not estimate the cost of performing a windshield inspection, but based on the size of the District's holdings and his inventory experience, he knew "it would be expensive." When Duntemann visited the site in early December 2008 and on January 9, 2009, he observed that some entity other than the District had pruned trees in the area and had inspected and marked the tree at issue and others in its vicinity for removal. He knew that, "for decades," "pretty much every suburb in the Chicago area" has

had a right-of-way maintenance agreement with the Department of Transportation for the state routes going through their towns and he believed Calumet City was no exception.

Discovery was still in progress when the District moved for summary judgment. The District contended that its property maintenance duties to the world were limited to the "intended and permitted" users of its property by the common law codified in section 3-102(a) of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/3-102(a) (West 2004)) (hereinafter Tort Immunity Act), and that it owed no duty of care to a person who was on adjacent or abutting property when he was injured due to a condition on the public property. The District argued Belton could never establish the duty element of his negligence claim. To prevail on a tort claim, a plaintiff must establish that the defendant owed a duty of care to the plaintiff, the defendant breached this duty, and the plaintiff incurred injury proximately caused by the breach. *Adams v. Northern Illinois Gas Co.* 211 Ill. 2d 32, 43, 809 N.E.2d 1248, 1257 (2004). The existence of a duty is a question of law for a court to decide and the issues of breach and proximate cause are factual matters for a jury to decide. *Adams,* 211 Ill.2d at 43-44, 809 N.E.2d at 1257; *Vega v. Northeast Illinois Regional Commuter RR. Corp.*, 371 Ill. App. 3d 572, 582, 863 N.E.2d 733, 742 (2007) (whether a duty of care is owed is appropriately resolved by the court in a summary judgment proceeding). Under Illinois law, the existence of a duty depends on whether the parties stand in such a relationship to each other that the law imposes on the defendant an obligation to act in a reasonable manner for the benefit of the plaintiff. *Eckburg v. Presbytery of Blackhawk of the Presbyterian Church (USA)*, 396 Ill. App. 3d 164, 169, 918 N.E.2d 1184, 1190 (2009). To determine whether there is a duty, a court looks to relevant

7

factors including the reasonable foreseeability of the injury, the reasonable likelihood of the injury occurring, the magnitude of the burden involved in guarding against the harm, and the consequences of placing that burden on the defendant. *Adams*, 211 Ill. 2d at 44, 809 N.E.2d at 1248; *Eckburg*, 396 Ill. App. 3d at 169, 918 N.E.2d at 1190. The foreseeability of the harm is balanced against the burden and consequences that would result from recognizing that a duty is owed by the defendant to the plaintiff. *Hutchings v. Bauer*, 149 Ill. 2d 568, 571, 599 N.E.2d 934, 935 (1992) (citing *Lamkin v. Towner*, 138 Ill. 2d 510, 522-23, 563 N.E.2d 449, 455 (1990)). The related question of the proper interpretation of the Tort Immunity Act is also a question of law to be resolved by a court and is also appropriately addressed in a summary judgment proceeding. *Barnett v. Zion Park District*, 171 Ill. 2d 378, 385, 665 N.E.2d 808, 811 (1996).

The trial court was persuaded by the District's no-duty-to-nonusers argument and did not reach the additional argument that the District was immunized from liability by section 3-106 of the Tort Immunity Act. 745 ILCS 10/3-106 (West 2004). See *Vega*, 371 Ill. App. 3d at 583, 863 N.E.2d at 742 ("the question of immunity does not arise unless it is shown that there is a duty owed"); *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 46, 697 N.E.2d 699, 708 (1998) ("The distinction between an immunity and a duty is crucial, because only if a duty is found is the issue of whether an immunity or defense is available to the governmental entity considered.").

On appeal, Belton argues the trial court misconstrued the scope of section 3-102 and should have recognized the District's common law duty to him to keep the roadway adjacent to the forest preserve reasonably safe for his use. In our *de novo* review, we consider whether the parties' pleadings, deposition transcripts, affidavits and any admissions, and exhibits on file show

8

there is no genuine issue of material fact and that the District is entitled to judgment as a matter of law. *Bubb v. Springfield School District 186*, 167 Ill. 2d 372, 383, 657 N.E.2d 887, 893 (1995); 735 ILCS 5/2-1005(c) (West 2006).

Local public entities will be held liable in tort for their ordinary negligence or willful and wanton conduct on the same basis as private tortfeasors unless the legislature has imposed conditions on such liability. *LaMonte v. City of Belleville*, 41 Ill. App. 3d 697, 705, 355 N.E.2d 70, 78 (1976); *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 368-69, 799 N.E.2d 273, 276 (2003) ("Unless an immunity provision applies, [public entities] are liable in tort to the same extent as private parties."). In 1965, the Illinois legislature enacted the Tort Immunity Act to protect local public entities and their employees from liability resulting from the operation of government. *Zimmerman*, 183 Ill. 2d at 43, 697 N.E.2d at 707. Certain sections of the statute, such as 3-102, restate and codify duties existing at common law, and, with those sections as a backdrop, sections such as 3-106 limit or altogether immunize governmental units from liability in tort. 745 ILCS 10/3-102(a), 3-106 (West 2004); *Wagner v. City of Chicago*, 166 Ill. 2d 144, 152, 651 N.E.2d 1120, 1124 (1995) (certain sections codify and others immunize; section 3-102 codifies a local public entity's general duty at common law regarding the maintenance of its property); *Boub v. Township of Wayne*, 291 Ill. App. 3d 713, 717, 684 N.E.2d 1040, 1042 (1997) (section 3-102 simply restates and codifies common law principles; it is not a source of new duties or liabilities for negligent acts or omissions which did not previously exist); *West v. Kirkham*, 147 Ill. 2d 1, 14, 588 N.E.2d 1104, 1110 (1992) (section 3-102's limited scope of duty is "in keeping with the scope of that duty as it existed at common law"); *Koltes v. St. Charles Park District*, 293

1-09-3126

Ill. App. 3d 171, 177, 687 N.E.2d 543, 547 (1997) (section 3-106 was intended to immunize public entities from liability in some instances).

Section 3-102 states:

"Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition *for the use* in the exercise of ordinary care *of people whom the entity intended and permitted to use the property* in a manner in which and at such times as it was reasonably foreseeable that it would *be used*, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition." (Emphasis added.) 745 ILCS 10/3-102(a) (West 2004).

This statute is plainly about maintaining public property in a suitable state "for the use" of the citizenry and it limits the public entity's duty of care to those "whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used." 745 ILCS 10/3-102(a) (West 2004). The statute's wording reflects the limited duty of care that is discussed in common law authority such as *Curtis*, *Latimer*, and *Poindexter*, which indicate motorists are the "intended and permitted" users of public streets, but drag racers, bicyclists, and pedestrians are not and the thoroughfares do not have to be maintained to the extent necessary for their specialized use. *Curtis v. County of Cook*, 98 Ill. 2d 158, 165, 456 N.E.2d 116, 120 (1983) (where driver of a car involved in drag race struck a

10

signpost that was alleged to be negligently placed, plaintiff passenger did not "fall within the class of motorists by whom defendant's highways were intended to be used"); *Latimer v. Chicago Park District*, 323 Ill. App. 3d 466, 473, 752 N.E.2d 1161, 1166 (2001) (bicyclist who fell because pavement was uneven and broken was not riding on a street "marked or signed to suggest that it was intended for use by bicycles"); *Poindexter v. City of Chicago*, 247 Ill. App. 3d 47, 50, 617 N.E.2d 206, 208 (1993) (pedestrian who fell into open manhole that was midblock in the center of busy street was not intended user of roadway and was "intended and permitted" user only of established crosswalk). The issue in *Curtis*, *Latimer*, *Poindexter*, and countless other public liability cases has been whether someone who was *using* a public street or other public property when her or she was injured due to a condition of the property was an "intended and permitted" user of the property and, therefore, owed the duty of care codified in section 3-102. Roadways are the obvious example of public property put to "use" by citizens; however, section 3-102's wording encompasses other types of public land such as sidewalks, parkways, alleys, medians, and the District's recreational property. See, *e.g.*, *Barnhisel v. Village of Oak Park*, 311 Ill. App. 3d 108, 112, 724 N.E.2d 194, 197 (1999) (when pedestrian was injured when she tripped, stumbled, and fell into landscaped area between the roadway and public sidewalk, the court's "initial determinations [were whether the area] can be characterized as a parkway or sidewalk and whether the plaintiff was an intended user of that area").

Section 3-102 and the underlying cases do not address the separate scenario of a *nonuser* of a public property, that is, someone on neighboring property, suffering an injury due to a condition of the public property, and they do not tell us whether the District owed a duty of care

11

to Belton. Some of the cases literally state that a public entity "has a duty to maintain its property *only* for people who are both 'intended and permitted' users of the property." (Emphasis added.) *Williams v. City of Chicago*, 371 Ill. App. 3d 105, 107, 861 N.E.2d 1115, 1117 (2007); *Curtis*, 98 Ill. 2d at 164-65, 456 N.E.2d at 120 ("[Section 3-102's] language evinces a legislative intent to extend a duty of care only to those persons by whom the local government intended the property to be used."). This phrasing would seem to support the District's position. However, because the cases concern people allegedly harmed while using public property due to a condition of that property, a more complete and accurate summation of the common law principle would be that *with respect to users of public property*, a public entity has a duty to maintain its property only for people who are both intended and permitted users of the property. Or, put another way, the District need not maintain its property for unintended, nonpermitted users. None of the authority cited by the District in its motion for summary judgment or its appellate response brief concerned a person who was making use of other property when he or she was injured due to a condition on neighboring public property. The District disregarded the factual, material difference between the authority it cited and Belton's allegations and the District gave no apparent consideration to whether the law reasonably should have been extended to this case.

The flaw in the District's interpretation is demonstrated by the wording of section 3-102 and cases which apply the underlying concept of nonliability, and also by cases which do not apply those principles. The District has argued its property maintenance duties to the world are limited to certain users of its property and do not encompass persons on adjacent or abutting property. However, there is considerable, well-settled authority indicating public entities are liable for

12

injuries occurring on adjacent or abutting land. Cases such as *Van Meter* indicate a public entity may be liable for changing the natural flow of surface water on its property to the detriment of neighboring landowners. *Van Meter*, 207 Ill. 2d at 369, 799 N.E.2d at 279. That particular case concerned a newly constructed municipal recreation area which caused surface water to flood an adjacent single family home in Darien, Illinois. *Van Meter*, 207 Ill. 2d at 369, 799 N.E.2d at 279. It joined a body of authority indicating that traditionally, public and private entities alike owe a common law duty not to increase the natural flow of water onto the property of an adjacent landowner. If it were true that a public entity's duties to maintain its property were owed to certain users of its property and no one else in the world, the *Van Meter* line of authority would not exist. See, *e.g.*, *Nevins v. City of Peoria*, 41 Ill. 502, 510-11, 1866 WL 4629 (1866) ("A city may elevate or depress its streets, as it thinks proper, but [will be held liable] if, in so doing, it turns a stream of mud and water upon the grounds and into the cellars of one of its citizens, or creates in his neighborhood a stagnant pond that brings disease ***."); *City of Dixon v. Baker*, 65 Ill. 518, 520, 1872 WL 8475 (1872) (municipal corporations are liable for negligently altering the natural flow of water onto the property of an adjacent landowner); Keith E. Roberts, Note, *Tort Liability of Municipal Corporations in Illinois*, 1951 U. Ill. L. F. 637, 645 ("The law seems to be well settled in Illinois that a municipal corporation may not construct public works and improvements in such a way as to cause surface water to flow in a different manner or in a substantially increased quantity upon the land of private owners."); *Van Meter*, 207 Ill. 2d at 385, 799 N.E.2d at 289(Fitzgerald, J., dissenting).

The District contends Belton misunderstood the significance of section 3-102 and refused

to acknowledge the established extent of the District's property maintenance duties. We find, however, that the summary judgment ruling is in error because it negates section 3-102's repeated references to "use" of the public entity's property and it lacks support in the common law. *Gallagher v. Union Square Condominium Homeowner's Ass'n*, 397 Ill. App. 3d 1037, 1043, 922 N.E.2d 1201, 1207 (2010) (reversing summary judgment where court misapplied law, courts must apply statutes as they are written by the legislature, rather than rendering terms superfluous). The District overstated the meaning of section 3-102 and failed to support its interpretation with any authority.

Our conclusion that section 3-102 was erroneously applied to Belton's action does not end our analysis, however, because when reviewing a summary judgment ruling, we are addressing the issues *de novo* without deference to the trial court's specific reasoning and may affirm a proper decision on any ground disclosed by the record. *City of Chicago v. Holland,* 206 Ill. 2d 480, 491-92, 795 N.E.2d 240, 247-48 (2003). Therefore, we must consider whether the ruling was correct for reasons other than section 3-102. If the District owed no duty of care to Belton, we may still affirm the decision.

In considering the duty issue, we have disregarded the parties' discussion of cases like *Reule*, in which the plaintiff successfully sued the City of Chicago for injuries she suffered while walking on a city sidewalk (*Reule v. City of Chicago*, 268 Ill. App. 266 (1932)), and *Dreier*, in which the plaintiffs were compensated by the State for injuries they suffered while driving on a State highway (*Dreier v. State*, 21 Ill. Ct. Cl. 72 (1951)). These cases indicate a public entity may be held liable for injury occurring on that entity's land, and they would be helpful if Belton had

sued Calumet City or the Department of Transportation for the injuries he suffered while driving on the roadway that one or both of these entities maintained (it is unclear from the record which entity was responsible for the roadway itself). These cases do not involve a person injured on one public entity's land due to a condition on the neighboring land of a different public entity, and neither *Reule* nor *Dreier* answers the question of whether the District is liable for injuries occurring on the non-District roadway. Instead, we have focused on authority involving trees which caused injuries to someone on the other side of a property line.

Historically, a landowner did not owe a duty of care to someone outside its property to prevent an unreasonable risk of harm arising from unsound or dead trees. *Mahurin v. Lockhart*, 71 Ill. App. 3d 691, 692, 390 N.E.2d 523, 524 (1979). "The traditional rule of non-liability developed at a time when land was mostly unsettled and uncultivated" and the landowner, "unable to keep a daily account of and remedy all the dangerous conditions arising out of purely natural causes, was therefore shielded from liability out of necessity." *Mahurin*, 71 Ill. App. 3d at 692-93, 390 N.E.2d at 524. The burden of inspecting and remediating natural conditions would have been out of all proportion to any harm likely to result. W. Page Keeton *et al*, Prosser and Keeton on Torts §57 (5th ed. 1984). But about 50 years ago, as population density increased and travel became more commonplace, courts began making exceptions to private landowners in residential urban or heavily-traveled rural areas. *Mahurin*, 71 Ill. App. 3d at 693, 390 N.E.2d at 524 (and cases cited therein dating to 1960); *Eckburg*, 396 Ill. App. 3d 164, 918 N.E.2d 1184. See also Restatement (Second) of Torts §363(2) (1965).

For instance, *Mahurin*, which was decided in 1979, concerned a homeowner who was

15

injured when a branch fell from his neighbor's tree, even though he had warned her it was in poor condition and menacing his property. *Mahurin*, 71 Ill. App. 3d at 691, 390 N.E.2d at 524. He sued her for failing to prune or take other precaution, and she countered with the established principle that she could not be held liable for a natural condition of her land. *Mahurin*, 71 Ill. App. 3d at 692, 390 N.E.2d at 524. The court held, however, that in urban areas, where the acreage is small, the land is less heavily wooded, and there is relatively frequent traffic, it would not be unduly burdensome for a small property owner to inspect his or her property and take reasonable precautions against dangerous natural conditions. *Mahurin*, 71 Ill. App. 3d at 692, 390 N.E.2d at 524, citing Restatement (Second) of Torts §363, cmt. *e*, . The court also reasoned that the risk of harm is higher and the burden of inspection is lighter on landowners in a congested, developed area. Restatement (Second) of Torts §363, cmt. *e* (1965); *Hutchings*, 149 Ill. 2d at 571, 599 N.E.2d at 1248 (in a negligence action, the foreseeability of the harm is balanced against the burden and consequences of imposing a duty of care on the defendant).

*Mahurin* is distinguishable in that it involved private, residential property and a single tree that threatened a neighboring residence while the District's property was public recreational space containing multiple trees in close proximity to a city street. However, similar physical conditions were considered by the Indiana appellate court in *Miles v. Christensen*, 724 N.E.2d 643, 644-45 (Ind. Ct. App. 2000), which involved a young motorcyclist killed in 1995 in northwestern Indiana on Indiana State Route 124 near Peru when a dead elm tree on abutting private property collapsed onto the roadway. The tree had been dead for years and was visible from the road. *Miles*, 724 N.E.2d at 645. The motorcyclist's parents alleged the private property

owners were negligent in failing to maintain their property in a reasonably safe condition and in failing to inspect the land and address the danger posed by their dying or dead trees. *Miles*, 724 N.E.2d at 645. The court considered the established urban/rural dichotomy and deemed it only "a useful starting point for determining a landowner's duty of care as to natural conditions" that might cause harm to one outside the land. *Miles*, 724 N.E.2d at 646. Instead, the court endorsed "a more sophisticated analysis of the duty question" requiring a consideration of factors such as traffic patterns and land use in the relevant area. *Miles*, 724 N.E.2d at 646. The court reasoned that in today's world, regardless of whether land is urban or rural, motor vehicle travel is common and frequent, and as a result, most of society is exposed to the danger of natural conditions intruding on the roads and threatening safe passage. *Miles*, 724 N.E.2d at 646. Sound public policy requires keeping the highways free of obstruction and hazard and this policy is implemented by recognizing a duty of care where the circumstances warrant. *Miles*, 724 N.E.2d at 646. The court concluded that despite the rural classification of the defendants' property, regular public visitation would be expected in an area that was one mile east of the city limits and abutting a motor highway, and that under these circumstances, the defendants did owe a duty to care to travelers to address natural conditions such as decaying or dead trees on the land abutting the road. *Miles*, 724 N.E.2d at 646. Accord *Husovsky v. United States ,*590 F.2d 944, 051, n. 15 (D.C. Cir. 1978) (indicating the urban-rural distinction became "less workable with the growth of suburbs and the increase in traffic through rural countryside").

This reasoning was influential in a subsequent Illinois case, *Eckburg*, involving a serious motorcycle accident in 2007 on a densely wooded, rural, but heavily traveled section of Illinois

Route 2. *Eckburg*, 396 Ill. App. 3d at 164, 918 N.E.2d at 1186. This stretch of the road connected the cities of Rockford, Byron, Oregon and Dixon and was the primary means of travel for the residential areas that surrounded the defendant's property. *Eckburg*, 396 Ill. App. 3d at 165, 918 N.E.2d at 1187. The defendant's property consisted of 360 acres of mostly undeveloped land where he operated a conference, retreat, and camping center. *Eckburg*, 396 Ill. App. 3d at 164, 918 N.E.2d at 1186. The trees on his property immediately adjacent to Route 2 had become closely spaced and rotten (*Eckburg*, 396 Ill. App. 3d at 164, 918 N.E.2d at 1186), and about a week before the accident a nearby resident telephoned the retreat center to report that at least one such tree had become " 'precariously perched' " over the road. *Eckburg*, 396 Ill. App. 3d at 165, 918 N.E.2d at 1187. The motorcyclist was severely injured and his wife was killed when they were struck by a collapsing tree. *Eckburg*, 396 Ill. App. 3d at 165, 918 N.E.2d at 1187. The trial judge dismissed the negligence suit in part because the property was in a rural area (*Eckburg*, 396 Ill. App. 3d at 166, 918 N.E.2d at 1188), but the appellate court rejected a rote urban/rural distinction as "overly simplistic." *Eckburg*, 396 Ill. App. 3d at 173-74, 918 N.E.2d at 1194. The court reasoned:

> "Given the increased travel on well-developed highways across our countryside, we do not believe that the law should be applied in such a way that provides relief for a plaintiff traveling on a town road and no relief to a plaintiff traveling on a major highway, simply because the town road is in an area deemed 'urban' and the highway is in one deemed 'rural.' " *Eckburg*, 396 Ill. App. 3d at 173, 918 N.E.2d at 1193-94.

Instead, the court endorsed the trend of analyzing the case like any other negligence action. As we noted above, a traditional duty analysis addresses (1) the reasonable foreseeability of the injury, (2) the reasonable likelihood of the injury occurring, (3) the magnitude of the burden involved in guarding against the harm, and (4) the consequences of placing that burden on the defendant. *Eckburg*, 396 Ill. App. 3d at 169, 918 N.E.2d at 1190. Accordingly, the court remanded the case for the trial judge to consider "the size and type of the road, the traffic patterns of the road, the nature of the surrounding land, the condition and location of the tree, the nature of the danger posed to the travelers, *** the burden of inspecting and removing the danger[, and any other factors the judge deemed relevant]." *Eckburg*, 396 Ill. App. 3d at 173-74, 918 N.E.2d at 1194, citing *Taylor v. Olsen*, 578 P.2d 779, 782 (Or. 1978) (landowner's duty of care regarding roadside trees cannot be determined by simply classifying the land as urban or rural, the question of a landowner's attention to the condition of his roadside trees is be addressed under a general standard of reasonable care and is to be decided as a question of fact); *Hensley v. Montgomery County*, 334 A.2d 542, 546-47 (Md. Ct. Spec. App. 1975) (rural landowner owed no duty of care, due to facts regarding the size and type of road, the use of the road, the volume of traffic, the bordering land use, and the defendant's notice of the tree's condition); *Heckert v. Patrick*, 473 N.E.2d 1204, 1208 (Ohio 1984) (duty analysis will depend upon whether the rural landowner had any actual or constructive notice of dangerous condition, the highway's location, and the size, type, and number of motorists on the road)).

The same analysis was used in an Illinois case decided while Belton's appeal was pending, *Ortiz v. Jesus People, U.S.A.,* No. 1-09-3255, slip op. at 2-3 (November 12, 2010), 939 N.E. 2d

19

1-09-3126

555, 557-58 (2010) which concerned a family of four out for a summer bicycle ride in Chicago's densely populated Uptown neighborhood, when violent, high winds struck and caused a large overhanging tree limb to fall from the defendant's residential property onto the adjacent public sidewalk. The limb was estimated to be 14 inches in diameter and more than 19 feet long. *Jesus People*, slip. op at 3, 939 N.E. 2d at 557. Defendant Jesus People, U.S.A., was a ministry that ran a not-for-profit midrise apartment building for senior citizens and offered other community services on its property. *Jesus People*, slip op. at 1-2, 939 N.E. 2d at 557. While bicycling through the city streets, the mother and daughter had become separated from the father and son and had stopped to wait on the sidewalk under the tree. *Jesus People*, slip op. at 2, 939 N.E. 2d at 558. The limb knocked the mother and daughter to the ground, and although the daughter's physical injuries were minor, the mother's injuries required four corrective surgeries, her mouth was wired shut for six weeks, and pieces of her rib were used to reconstruct her nose. *Jesus People*, slip op. at 2-3, 939 N.E. 2d at 558. The limb also fell onto an overhead wire and snapped off the nearby light pole. *Jesus People*, slip op. at 2, 939 N.E.2d at 558. The tree was a Siberian elm, which is an undesirable species in an urban setting because it is brittle and known for its falling branches. *Jesus People*, slip op. at 3, 939 N.E. 2d at 558. The ministry had relied on its own personnel rather than a professional tree service to inspect and maintain its trees. *Jesus People*, slip op. at 4, 939 N.E. 2d at 558. The untrained employee merely looked for visible defects and trimmed back low-hanging branches. *Jesus People*, slip. op at 8, 939 N.E.2d at 562. The court, however, noted the characteristics of Siberian elms, that the overhanging limb was quite large, and that it was "easy" to determine the condition of the tree, particularly when the

20

defendant had owned the property for 20 years. *Jesus People*, slip op. at 10, 939 N.E. 2d at 562. "Aside from the fact that the property was \*\*\* in Chicago, an urban area, the tree was, by defendant's own admission, one of only four in defendant's garden and, as such, obviates any need for a balancing of the burden of inspection and removal of the danger with the potential for harm." *Jesus People*, slip. op. at 10, 939 N.E. 2d at 562. "Most importantly, the tree was adjacent to a public sidewalk on a busy public street and a large limb extended over that sidewalk." *Jesus People*, slip. op at 10, 939 N.E.2d at 562. The court concluded the defendant had a duty to the plaintiff to " 'find out [the condition of the tree] and \*\*\* take appropriate action [to prevent injury].' " *Jesus People*, slip. op. at 10, 939 N.E. 2d at 562.

With the traditional negligence analysis in mind, we have considered the record on appeal and determined there are insufficient facts to conclude whether the District owed a duty of care to Belton. None of the existing authority involve a defendant quite like this defendant. The District is a public entity empowered by the Illinois legislature to "create forest preserves," to hold property "for the purpose of protecting and preserving the flora, fauna, and scenic beauties within such district," and "to restore, restock, protect and preserve the natural forests and such lands together with their flora and fauna, as nearly as may be, in their natural state and condition, for the purpose of the education, pleasure, and recreation of the public." 70 ILCS 810/7 (West 2004). The record does not disclose the size of the District's property holdings in Cook County, how many miles of District property border public thoroughfares, or other details that may collectively indicate whether "the magnitude of the burden of guarding [against the danger], and \*\*\* the consequences of placing that burden on the [District]" is appropriate. *Adams*, 211 Ill. 2d at 44,

809 N.E.2d at 1248; *Hutchings*, 149 Ill. 2d at 571, 599 N.E.2d at 935; *Jesus People*, slip op. at 10, 939 N.E.2d at 561. Discovery was still in progress when the District moved for summary judgment on the erroneous grounds that its property maintenance duties to the world were limited to the intended and permitted users of its property. Thus, lacking adequate factual basis for resolving the duty question, we hold that the District was not entitled to judgment. The parties should be allowed to proceed with discovery about the relevant factors so that the trial court may fully consider whether the District had a duty to Belton to exercise reasonable care in maintaining the trees that abutted 159th Street/River Oaks Drive. The factors suggested above are not exclusive and should not limit the parties' efforts or the trial court's analysis. We express no opinion whether there is a duty in this instance. We conclude only that the District's argument and the trial court's grant of summary judgment on this ground was in error. Questions remain which cannot be answered by the record compiled thus far.

Normally we would not reach the issue of immunity unless we had concluded a duty existed. *Vega*, 371 Ill. App. 3d at 583, 863 N.E.2d at 742; *Zimmerman*, 183 Ill. 2d at 46, 697 N.E.2d at 708. Nonetheless, the District contends that the immunity codified in section 3-106 of the Tort Immunity Act is an alternative ground for affirming the judgment in the District's favor. 745 ILCS 10/3-106 (West 2004).

In some instances, public entities are immunized from liability for ordinary negligence in order to encourage them to undertake activities such as developing and maintaining public parks, playgrounds, and similar recreation areas without concern that doing so will expose taxpayer funds to damage awards. *Lewis v. Jasper County Community Unit School District No. 1,* 258 Ill.

App. 3d 419, 422, 629 N.E.2d 1227, 1229 (1994); *Bubb*, 167 Ill. 2d at 378, 657 N.E.2d at 891 ("By providing immunity [from negligence claims], the legislature sought to prevent the diversion of public funds from their intended purpose to the payment of damage claims.").

Section 3-106 states:

"Neither a local public entity nor a public employee is liable for an injury where the liability is based on the existence of a condition of any public property intended or permitted to be used for recreational purposes, including but not limited to parks, playgrounds, open areas, buildings or other enclosed recreational facilities, unless such local entity or public employee is guilty of willful and wanton conduct proximately causing such injury." 745 ILCS 10/3-106 (West 2004).

Because this statute concerns property "used for recreational purposes" and the fact that District cites only cases involving users of public property rather than nonusers like Belton, we conclude section 3-106 is inapplicable. 745 ILCS 10/3-106 (West 2004). People who are injured within the boundaries of public property due to a condition of the property are not like Belton who was merely driving by the District's Green Lake site on a non-District roadway when the District's tree collapsed onto that adjacent land.

Section 3-106 has been applied to injuries occurring at facilities such as a public parking lot and public sidewalk that are not themselves recreational property but "increase the usefulness of public property intended or permitted to be used for recreational purposes." *Sylvester v. Chicago Park District*, 179 Ill. 2d 500, 508, 689 N.E.2d 1119, 1124 (1997) (applying recreational property immunity to injuries occurring in District's parking lot at Solider Field

23

because parking facilities increased the usefulness of the stadium property); *Bubb*, 167 Ill. 2d at 382-83, 657 N.E.2d at 893 (1995) (sidewalk deemed public recreational property within meaning of section 3-106 where school painted four-square court on sidewalk and allowed children to play on it). This extension of the law does not justify further expanding the application of section 3-106 to injuries occurring outside a public entity's property line.

The District's interpretation of section 3-106 is too expansive and would overcome the common law duty of due care codified by section 3-102(a) of the Act (745 ILCS 10/3-102(a) (West 2000) (a local public entity has a duty to exercise ordinary care to maintain its property in a reasonably safe condition)). Section 3-106 was not intended to immunize the District from any and all tort claims. *Rexroad v. City of Springfield*, 207 Ill. 2d 33, 796 N.E.2d 1040 (2003) (despite legislature's rationale for providing immunity in section 3-106, court declined to expand immunity to non-recreational pathways on school property that provided access to recreational property); *Larson v. City of Chicago*, 142 Ill. App. 3d 81, 87, 491 N.E.2d 165, 168 (1986) (reasoning that section 3-106 was not intended to address every injury involving public recreational property); *John v. City of Macomb*, 232 Ill. App. 3d 877, 881, 596 N.E.2d 1254, 1257 (1992) (pointing out that despite statutory amendment, *Larson* court's observation still held true). See also *Milligan v. City of Laguna Beach*; 670 P.2d 1121 (Cal. 1983) (holding that California governmental tort immunity statute would apply if decayed eucalyptus tree limb fell on user of governmental property and would not apply to injuries caused to nonusers on adjacent property); *Bany v. Borough of Haworth*, 632 A.2d 535 (N.J. Super Ct. App. Div. 1993) (holding that legislative purpose for New Jersey governmental tort immunity statute, encouraging public

24

agencies to open unimproved lands to public use, was not thwarted when immunity was not applied to injuries caused by dead tree collapsing onto adjacent public road or private residential property). The plain wording of the Illinois statute must be given effect. Accordingly, we conclude section 3-106 does not afford immunity under the established facts.

Our final consideration is the common law public duty rule, which the District offers as a second alternative basis for affirming the trial court's ruling. Once again we reject the District's overly broad application of a legal concept.

Under the public duty rule, a municipality and its employees owe no duty to provide an individual citizen with specific municipal services such as police and fire protection, or to enforce local laws and building codes. *Burdinie v. Village of Glendale Heights*, 139 Ill. 2d 501, 508-09, 565 N.E.2d 654, 658-59 (1990). The government's duty "to preserve the 'well-being of the community' *** is 'owed to the public at large rather than to specific members of the community' " and thus, generally, there is no liability to an individual claiming injury due to a government's action or inaction. *Zimmerman*, 183 Ill. 2d at 44, 697 N.E.2d at 707, quoting *Schaffrath v. Village of Buffalo Grove*, 160 Ill. App. 3d 999, 1003, 513 N.E. 2d 1026 (1987); *Ferentchak v. Village of Frankfort*, 105 Ill. 2d 474, 485, 475 N.E.2d 822, 828 (1985) (village owed no duty to home buyer to specify minimum foundation level/surface water drainage for each lot in new subdivision; municipal building codes provide "[p]assive public protection as opposed to active individual assistance"); *Fryman v. JMK/Skewer, Inc.*, 137 Ill. App. 3d 611, 615-16, 484 N.E.2d 909, 912 (1985) (county health department's statutory duty to inspect did not translate into liability to individual restaurant patrons served food contaminated with botulism). The public

1-09-3126

duty rule is not an immunity provision; rather, it denies the existence of a duty in the first place. *Zimmerman*, 183 Ill. 2d at 46, 697 N.E.2d at 708.

The District argues the "Illinois common law [public duty rule] firmly supports a policy of no duty to individuals," and that since Belton is an individual, he can never establish the duty element of his tort claim. This is not an accurate statement. If it was an accurate statement of the rule, then the rule would conflict with most of municipal liability law, including the immunity statute and precedent discussed above which the District itself has argued indicate the District owes property maintenance *duties* to individual intended and permitted users of its property. If the District really owed no duties to individuals, then there would be no need for the statutory immunities. We are unpersuaded by the District's alternative argument.

For these reasons, we find that the trial court erred in finding section 3-102 was dispositive of Belton's claim and granting summary judgment to the District on the ground that it owed no duty to Belton. We direct the trial court to consider whether a duty is owed under the particular facts of this case, without reference to whether Belton was an intended and permitted user of District property but under a traditional duty analysis. We vacate the summary judgment ruling and remand this action for further proceedings consistent with our decision.

Vacated and remanded.

26